[No. 30772. Department One. May 3, 1949.]

F. E. BUYKEN et al., Respondents, v. A. C. ERTNER et al., Appellants.[1]

[1]Reported in 205 P. (2d) 628.

*Hyland, Elvidge & Alvord* and *John Veblen,* for appellants.

*Meier & Murray,* for respondents.

STEINERT, J.—Plaintiffs brought suit to recover the balance of an account alleged to be due and owing to them for machine work performed upon certain constituent parts of a quantity of steel wrenches owned by, and in process of manufacture for, the defendants. In answer to the complaint, defendants denied all liability, pleaded affirmatively payment in full, and cross-complained for an alleged amount of overpayment and for damages claimed to have been sustained by them as the result of plaintiffs' poor workmanship on the wrenches. Plaintiffs in their reply de-

nied the affirmative allegations of the answer and cross-complaint. The cause was tried to the court without a jury. The court made findings of fact and conclusions of law, upon which it entered judgment for the plaintiffs in the full amount prayed for and dismissed defendants' cross-complaint with prejudice. Defendants appealed. In their appeal, however, they assign no error and make no attack upon that part of the judgment which dismissed their cross-complaint.

The facts as found by the trial court are as follows: Respondents, F. E. Buyken and George Buyken, were at all times herein mentioned partners engaged in the machine shop business in Seattle, under the firm name of Buyken Machine Works. Respondent F. E. Buyken and one Arthur Larsen, superintendent of Buyken Machine Works, were authorized to, and did, act for the respondents in the matters involved in this action, and they will hereinafter be referred to, respectively, as Buyken and Larsen. At the same time, appellants, A. C. Ertner and J. Frank Thorn, were copartners engaged in a commercial business in Seattle, under the firm name and style of Federal Trading Company. Appellant Ertner was authorized to, and did, act on behalf of the appellants in the matters with which we are here concerned.

In the year 1944 appellants were centering their attention upon the development of a mechanical wrench, known as the "Ertner Speed Wrench," which Ertner himself had invented. The device consisted of several parts, *viz.*, a handle, a movable jaw, a hood or casing, and two metal pieces called locks. The handle and movable jaw of this wrench, as then designed, were of cast material.

Having in view the manufacture of the wrench in quantities, appellants in the early part of 1944 placed with the respondents an order for the making of certain dies, to be subsequently used in the manufacture of the hoods and locks. On completion of these dies, they were paid for by the appellants. However, none of the parts of the wrench were manufactured at that time, due to the fact that the device had not been sufficiently developed to make it a

success. Appellants thereupon continued their development work, and, in the meantime, Ertner had the contrivance patented.

In the month of October, 1945, Ertner approached Buyken with the idea of having respondents produce certain parts for the wrench as then developed. The understanding between the parties, arrived at through oral conversation, was that the handle and movable jaw were to be forged instead of cast, and that the appellants were to supply the forgings upon which respondents were to perform the required work. In the process of production, respondents were to use the dies which they had formerly made and which were the property of the appellants. Buyken at that time also informed Ertner that respondents could produce the requested parts, but that the appellants would be required to pay for any changes made in the dies and for any necessary "tooling." Ertner agreed to these terms, although it was not then known exactly what changes would have to be made in the old dies, or what tooling would be required; nor was any price or rate then agreed upon with respect to such additional work, if any were performed. At the same time, Buyken also informed Ertner that respondents could not quote a price for the "production work" until Buyken had seen a sample, and ascertained the quality, of the forging work to be done by the forge company from which appellants were to secure the basic material.

Tooling and production work are two separate and independent processes. Tooling comprehends all special die work, including the manufacture of, and changes in, dies and the making of special jigs, drill jigs, broaches, drills, and other special tools for performing a manufacturing process. The dies and tools, when completed, belong to the person paying for them and may be taken by him to any machine shop he desires for the purpose of performing the process of production. On the other hand, production work comprehends the actual process of manufacturing the article after the tools and dies have been made or furnished and set up in machinery designed for applying power or pressure. Production work includes drilling, broaching,

milling, and stamping, but does not include the making or furnishing of special dies and tools for performing the process of manufacture.

In the latter part of November or the early part of December, 1945, Ertner exhibited to Buyken a sample of the forging work to be supplied to respondents. This was not in the form of a model of the wrench, but merely a piece of forged steel, from which the quality of the forging work could be ascertained. On that same occasion, Buyken advised Ertner that he would think over the matter of the price to be charged for the contemplated production work.

In a conversation between Buyken and Ertner on or about December 19, 1945, it was orally agreed between them that respondents would do the production work on certain wrench parts, as follows:

"Milling the face of the jaw, squaring the jaw off at a right angle with the handle, placing certain teeth or notches in the handle; drilling and broaching a rectangular aperture and drilling a pin-hole through the movable jaw; and stamping the hoods and locks. Defendants [appellants] were to furnish all material. The forgings (the handle and movable jaw) were to be first class. On the basis of a 5,000 lot the price *for the production work* was to be 55¢ per wrench." (Italics ours.)

Confirming the foregoing oral agreement relative to production work, respondents at the request of Ertner, on December 29, 1945, wrote and mailed to appellants a letter, which reads as follows:

"Federal Trading Company              December 29/45
618 4th Ave.
Seattle 4 Wash.
"Gentlemen:

"In reference to our recent conversation we submit the following:—

"On the jaw we will drill and broach and drill one hole.

"On the wrench we will mill face of jaw and teeth on wrench and stamp all parts.

"You are to furnish all material. The forgings must be first class as per our conversation.

"On the basis of a 5000 lot our price on above is fifty five cents each.

"Very truly yours
Buyken Machine Works
By CECIL J. CUMMINS
Bkkpr."

FEB/CJC

The two agreements hereinabove referred to, one made in October, 1945, relating to tooling, and the other made in December of that year, relating to production work, were expressly found by the court to constitute separate agreements, the subject matter of each being such as might naturally be the subject of a separate agreement between the parties.

Thereafter, appellants purchased from various wholesale concerns supplies of forgings, strip steel, and sheet steel, and these supplies were delivered to the respondents during the summer and fall of 1946, for use by them in the production work. During that same period, respondents commenced and completed the work of milling the handles of the wrenches, squaring the jaws, cutting the teeth therein, drilling and broaching the jaws, and shearing, stamping, and forming the hoods and locks. As the work was completed in lots, the product was delivered to appellants.

It appears that the forged wrench handles which were furnished by appellants were about one-eighth inch greater in width than were the handles of the original cast wrench for which dies had been manufactured by respondents in 1944. In addition, the old dies for stamping the hoods were peculiarly adaptable to material of a different gauge than that of the material supplied by appellants under the written agreement. This necessitated a rebuilding of the old dies and the manufacture of new drills, drill jigs, and broaches. The necessary changes of dies and manufacture of new tools were accomplished by respondents at the oral request and direction of the appellants.

It further appears that many other tooling changes later became necessary in order to remedy imperfect assembly "tolerances," caused in part by the lack of uniformity in width and thickness of the forged wrench handles, and in

part by insufficient preliminary engineering on the part of Ertner prior to the commencement of production. These further changes were likewise accomplished by respondents at the request and direction of the appellants.

During the course of these progressive changes in dies and tools, Larsen, the superintendent for respondents, advised Ertner that the tooling was running into a large sum of money, whereupon Ertner stated that "he was going to pay for it" and instructed Larsen to proceed with the changes, which the respondents did.

The process of tooling which Ertner requested and directed consumed 491¾ hours, the reasonable value of which was $4.00 an hour, totaling $1,967.

In the month of December, 1946, Ertner came to respondents' place of business and complained to Larsen that the cost of tooling was too high. After consultation and negotiation with Buyken, it was orally agreed that appellants should be allowed a credit of $300, which would reduce the cost of tooling to $1,667. Pursuant to such agreement, appellants were allowed a credit in the sum of $300, and a credit memorandum was accordingly sent to them.

In May, 1947, respondents, having without success pressed appellants for payment of the account, threatened suit, whereupon appellants for the first time complained of the quality of respondents' work. However, as expressly found by the trial court, respondents performed their work as directed and specified by appellants, and any defects which existed in the parts produced by respondents were due to the quality of material supplied by the appellants, the variations in the sizes of the handles and movable jaws furnished by appellants, and the many changes directed by appellants during the process of production.

The foregoing statement of the case is based upon, and closely follows, the extended findings of fact made by the trial court. The evidence in the case, produced at a trial lasting several days, fully supports the court's findings.

Although appellants' assignments of error include, *inter alia*, a challenge to eighteen of the trial court's twenty-nine findings of fact, appellants do not now contend that the

evidence, *if admissible,* is nevertheless insufficient to support those findings. Resting their case strictly upon the letter of December 29, 1945, appellants frankly state in their brief that all of their assignments of error revolve around one point, namely, the admission of oral testimony of an alleged separate agreement to pay for "tooling." Their statement of the question involved upon the appeal is expressed as follows:

"May a valid, integrated agreement be added to or varied by permitting the introduction of oral testimony to prove terms not included in such integration where it is claimed by the proponent that such terms were agreed upon prior to or contemporaneously with such integration?"

This question, as stated by appellants, must of course be considered in the light of the evidence and findings referred to above.

It is apparent that the question with which we are here primarily concerned relates to the subject commonly known and referred to as the "parol evidence rule."

■ Under that rule, which is well established at common law and obtains in this jurisdiction, parol or extrinsic evidence is not admissible to add to, subtract from, vary, or contradict written instruments which are contractual in nature and which are valid, complete, unambiguous, and not affected by accident, fraud, or mistake. *Clise v. Scott,* 180 Wash. 207, 38 P. (2d) 1019; *Asher Bros. General Illuminating Co. v. General Illuminating Co.,* 193 Wash. 105, 74 P. (2d) 495; *Alaska Pac. Salmon Co. v. Matthewson,* 3 Wn. (2d) 560, 101 P. (2d) 606; *St. Paul & Tacoma Lbr. Co. v. Fox,* 26 Wn. (2d) 109, 173 P. (2d) 194; 32 C. J. S. 784, Evidence, § 851.

In *McGregor v. First Farmers'-Merchants' Bank & Trust Co.,* 180 Wash. 440, 40 P. (2d) 144, we at some length discussed the rule, its nature, its extent, and its limitations. We quote the following from the opinion therein:

"A few observations relative to the parol evidence rule may first be made. The rule, as generally and somewhat tersely stated, is that parol evidence cannot be received to contradict, vary, add to or subtract from the terms of a writ-

ten instrument. The actual rule, however, as it is usually stated, is that all conversations and parol agreements between the parties prior to a written agreement are so merged therein that they cannot be given in evidence for the purpose of changing the contract or showing an intention or understanding different from that expressed in the written agreement. 3 Jones on Evidence (2d ed.), p. 2699; 1 Greenleaf on Evidence (16th ed.), § 275; 5 Wigmore on Evidence (2d ed.), § 2425; Taylor on Evidence (11th ed.), § 1132.

"The parol evidence rule is not a rule of evidence, but is a rule of substantive law. *Andersonian Inv. Co. v. Wade,* 108 Wash. 373, 184 Pac. 327; 3 Jones on Evidence (2d ed.) § 1482, p. 2695; 5 Wigmore on Evidence (2d ed.), § 2400, p. 236. Hence, evidence properly falling within the inhibition of the rule does not become admissible merely because it has probative value or is not objected to. The rule applies not only to agreements whose terms are fully expressed in writing, but also to written agreements wherein certain obligations are implied by law. *Bryan v. Duff,* 12 Wash. 233, 40 Pac. 936, 50 Am. St. 889; *Allen v. Chambers,* 13 Wash. 327, 43 Pac. 57; 10 R. C. L. § 240, p. 1046. Or, expressed somewhat differently, the rule applies not only to the letter of the written document, but also to its legal effect. *Smith Sand & Gravel Co. v. Corbin,* 81 Wash. 494, 142 Pac. 1163; *United Iron Works v. Wagner,* 89 Wash. 293, 154 Pac. 460, 3 Jones on Evidence, p. 2698; 4 Page on Contracts, § 2148."

Although the parol evidence rule is of broad application, extensive in scope and affecting practically every branch of the law governing civil rights, it nevertheless has definite exceptions and limitations, which are as firmly established as the rule itself. *McGregor v. First Farmers'-Merchants' Bank & Trust Co., supra.*

In consequence of the broad application of the rule as well as that of its exceptions, and because of the salutary purposes which are sought to be accomplished by resort to each and all of them, respectively, as the particular circumstance may require, it is not at all surprising that the adjudicated cases reveal what appears to be an irreconcilable conflict of decision. The situation presented by the impact of various circumstances upon each other is succinctly and

accurately described in 32 C. J. S. 852, Evidence, § 929, as follows:

"There is perhaps no rule of law or of evidence which is more flexible or subject to a greater number of exceptions than the rule which excludes parol evidence offered to vary or explain written documents.

"While it has been said that in the multitude of exceptions much confusion has arisen, so that the exact limit to be placed on the exceptions depends not only on the peculiar facts of each case, but also to some extent on the peculiar cast of thought of the individuals composing the court, it may be stated generally that the courts have endeavored to adapt their rulings, either way, to the obvious demands of abstract justice in each particular case. The result is that, while the decisions are fairly uniform with respect to their abstract statements of the limitations of and exceptions to this rule, when the question arises as to whether a case presenting a particular state of facts comes within the general rule, or is taken out of it by one of the recognized limitations or exceptions, or again brought within it by one of the numerous limitations of, and exceptions to, those limitations and exceptions, the authorities are in many instances in hopeless conflict."

Whatever conflict may exist among the various decisions concerning the general application of the parol evidence rule and its exceptions or limitations, there are, among the multitude of such exceptions, two that are well recognized and generally accepted. One is comprehended in the doctrine of "partial integration," and the other in the doctrine of "collateral contract." While there is some distinction between these two doctrines, there is nevertheless a considerable similarity between them, both in their general application and also in the limitations governing them. 20 Am. Jur. 988 to 994, inclusive, Evidence, §§ 1135 to 1140, inclusive. The existence of these two exceptions is recognized and to some extent discussed in *Sears, Roebuck & Co. v. Nicholas,* 2 Wn. (2d) 128, 97 P. (2d) 633.

The doctrine of partial integration supplies an exception to the parol evidence rule in cases where one part of a transaction between parties has been committed to writing, but another part has been left in some other form.

The doctrine is referred to, and described in, 20 Am. Jur. 988, Evidence, § 1135, in the following manner:

"A well-settled exception to the parol evidence rule exists where the entire agreement has not been reduced to writing —that is, where there is what a learned writer on the law of evidence [9 Wigmore, Evidence (3d ed.) § 2430] calls 'a partial integration.' In such a case parol evidence to prove the part not reduced to writing is admissible, although it is not admissible as to the part reduced to writing."

The same thought, although not employing the term "partial integration," is expressed in 32 C. J. S. 1028, Evidence, § 1013, as follows:

"Where a written instrument, executed pursuant to a prior verbal agreement or negotiation, does not express the entire agreement or understanding of the parties, the parol evidence rule does not prevent the introduction of extrinsic evidence with reference to matters not provided for in the writing."

In Restatement, Contracts (1932) 335, § 240, the rule is stated in the following form:

"An oral agreement is not superseded or invalidated by a subsequent or contemporaneous integration, nor a written agreement by a subsequent integration relating to the same subject-matter, if the agreement is not inconsistent with the integrated contract, and
"(a) is made for separate consideration, or
"(b) is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written contract."

In determining whether or not a written contract embraces the entire agreement between the parties, there is a difference of opinion among the courts as to the scope of inquiry. *Sears, Roebuck & Co. v. Nicholas, supra.*

Discussing the matter at some length, Professor Wigmore in his work on Evidence, in vol. IX, § 2430, stated the problem and suggested the proper method for solution in a given case, as follows:

"More correctly, the inquiry is whether the writing was intended to cover a *certain subject* of negotiation; for if it was not, then the writing does not embody the transaction

on that *subject*; and one of the circumstances of decision will be whether the one subject is so associated with the others that they are in effect 'parts' of the same transaction, and therefore, if reduced to writing at all, they must be governed by the same writing.

"In searching for a general test for this inquiry, three propositions at least are capable of being generally laid down:

"(1) Whether a particular subject of negotiation is embodied by the writing *depends wholly upon the intent of the parties* thereto. . . .

"(2) This intent must be sought where always intent must be sought . . ., namely, in the *conduct and language* of the parties and the *surrounding circumstances.* . . .

"(3) In deciding upon this intent, the chief and most satisfactory index for the judge is found in the circumstance whether or not the *particular element of the alleged extrinsic negotiation is dealt with at all* in the writing."

While the three propositions suggested by Mr. Wigmore may properly have a place in determining whether or not a written contract embraces the entire agreement between the parties, they must nevertheless be considered in light of, and subject to, the principle to which this court is committed, namely, that where a written agreement *purports* to cover the entire subject matter with respect to which the parties are contracting, and fraud or mutual mistake is not claimed, evidence of a contemporaneous or prior oral agreement contradicting or altering the terms of the writing is inadmissible. *Allen v. Farmers' & Merchants' Bank,* 76 Wash. 51, 135 Pac. 621; *Alaska Pac. Salmon Co. v. Matthewson, supra; Hazlett v. First Federal Savings & Loan Ass'n,* 14 Wn. (2d) 124, 127 P. (2d) 273.

However, the converse of this principle is equally true and has been so declared by this court, namely, that where it appears that only a part of the contract is in writing, the part not in writing may be proved by parol, in so far as it is not inconsistent with the written portion. *Interstate Engineering Co. v. Archer,* 64 Wash. 629, 117 Pac. 470; *Gaffney v. O'Leary,* 155 Wash. 171, 283 Pac. 1091; *Wick Co. v. Du Barry,* 159 Wash. 380, 293 Pac. 447.

■ At this point, we turn, momentarily, to a consideration of the doctrine of "collateral contract," mentioned above, which, briefly stated, is that parol evidence does not affect a purely collateral contract, distinct from, and independent of, the written agreement, and, consequently, such separate and independent contract between the parties may be proved by parol.

This principle is comprehensively, yet succinctly, enunciated in 32 C. J. S. 970, Evidence, § 997, in the following paragraph:

"The rule excluding parol evidence to vary or contradict a writing does not extend so far as to preclude the admission of extrinsic evidence to show a valid prior or contemporaneous collateral parol agreement between the parties, which is separate and distinct from, and independent of, the written instrument, has not been merged in, or superseded by, such instrument, and does not contradict, conflict with, or vary the express or implied provisions thereof or deal with a definite and particular subject matter which the written instrument expressly or impliedly undertakes to cover."

Our decisions are in accord with the principle last above expressed. In *Bayers v. Barry*, 114 Wash. 252, 194 Pac. 993, a written contract covered the transfer of property to a corporation and the consideration to be received therefor. In holding that an oral agreement to pay expenses incurred by one of the incorporators in making preparations to start business was enforcible, this court said:

"There is nothing inconsistent between the oral and written agreements. The subject-matter of the alleged oral agreement was not the same as that of the written contract. Such being the case, the oral contract was enforcible, whether made before, contemporaneous with, or after the written contract."

In *King v. Second Avenue Inv. Co.*, 117 Wash. 41, 200 Pac. 572, a broker's contract contained alternative provisions, one in writing and one oral. The defendant contended that evidence of the oral agreement tended to vary and contradict the terms of the written contract covering the same subject matter. Rejecting that contention, we said:

"We are quite unable to see that there is any inconsistency of one part with the other, viewing the whole as one contract; or of one contract with the other, viewing them as separate contracts. The oral portion of the one entire contract viewed as such, and the separate oral contract viewed as such, was merely an alternative agreement prescribing the measure of appellants' [plaintiffs'] compensation in the event a loan of less amount was consummated as the result of respondent's [defendant's] efforts. How can it be said that the two contracts, or the two portions of one contract, though concerning the same general subject-matter, are inconsistent or in the least tend to destroy each other, when it is manifestly intended by their terms that one is merely the alternative of the other, each to be controlling of the rights of the parties according as one or the other of two contemplated possible events may occur, it being plain that both cannot occur? We think this is one contract with alternative stipulations, one in writing and one oral, which are not in the least inconsistent, and that evidence of the oral stipulation is not contradictory of the written stipulation."

In *McGregor v. First Farmers'-Merchants' Bank, supra,* involving a cashier's check, the acceptance of which was induced by a contemporaneous parol agreement, this court said:

"The terms of the check were not, under the peculiar circumstances, inconsistent with the contemporaneous agreement between the parties. The parol agreement was separate and distinct from the agreement implied by the check. Although an agreement between parties is reduced to writing, the law does not merge into the writing prior or contemporaneous agreements which are distinct, valid, and and not in conflict with the writing. 3 Jones on Evidence (2d ed.), § 1440, p. 2712. The contemporaneous agreement did not, in this instance, become merged in the agreement implied by the check."

In *Mapes v. Santa Cruz Fruit Packing Corp.,* 26 Wn. (2d) 145, 173 P. (2d) 182, the effect and extent of the rule and of the exception thereto are stated in these words:

"In the final analysis, the question always resolves itself down to this: Does the parol testimony actually vary or change the terms of a written contract? If it does, it is not admissible. However, if, contemporaneously with the exe-

cution of a writing, the parties entered into a distinct, collateral contract, which had not been reduced to writing, such contract may be proved by parol testimony so long as such evidence is not inconsistent with, and does not contradict, the writing."

Having in mind the two well-settled exceptions to the parol evidence rule, as comprehended in the doctrine of "partial integration" and the doctrine of "collateral contract," hereinbefore defined and explained, we come to the point of determining whether or not the instant case falls within either one, or possibly both, of these exceptions.

■ Looking directly and exclusively, for the time being, to the written agreement founded upon the letter of December 29, 1945, we think it is apparent, from its very phraseology, that the writing does not purport to express the entire agreement or understanding which the parties must have had with each other. Considered by itself alone, the letter of that date amounts to nothing more than an offer to do certain kinds of work according to the specifications as therein set forth. In that respect, the offer was probably sufficient, when accepted by the appellants and acted upon by both parties, to constitute a so-called "partial integration" concerning certain details of the production work. Obviously, however, the agreement evidenced by the letter did not cover, nor purport to cover, the entire subject matter with respect to which the parties were contracting. Under such circumstances, parol evidence was admissible to prove that part of the agreement not in writing, in so far as the oral portion of the agreement was not inconsistent with the written portion. It is nowhere suggested that respondents ever charged, or sought to charge, appellants more than fifty-five cents for work relating to the *manufacture or production of parts* for the wrench. The oral portion of the agreement therefore cannot be said to be inconsistent with the written portion thereof.

■ On the other hand, if we view the matter from the standpoint of both the written agreement and the oral agreement, considered in relation to each other, we arrive at the same result, under the doctrine of "collateral contract."

As stated above, the trial court specifically found that "tooling" and "production work" were two separate and distinct processes; that the subject matter of the oral contract, which related to tooling, was such as might naturally be the subject of a separate agreement between the parties concerned; and that the parties did, as a matter of fact, make two separate and distinct agreements, one with reference to tooling and the other with reference to production work. The evidence supports, and we are in accord with, those findings.

The letter, referred to above, was a unilateral, informal writing, which quoted a price on work to be done solely as part of the *manufacturing* process. The oral agreement dealt solely with *tooling* preliminary to production, the full extent of which tooling could not have been known to the parties prior to, or at the time of, the writing of the letter. The evidence shows that the handles of the new, forged wrench were one-eighth of an inch larger than those of the cast wrench for which the dies already on hand at the commencement of negotiations had been manufactured; there was uncertainty as to the thickness of the sheet metal to be used for the hoods; no exact sample of the new, forged wrench, nor blueprint thereof, had been furnished to respondents prior to the writing of the letter. In other words, the nature of the oral agreement was, under all the attendant circumstances, sufficiently collateral to the subject matter covered by the letter to warrant admission of parol evidence, under the "collateral contract" doctrine discussed above.

The two agreements were separate and distinct, and, in our opinion, the two are not at all inconsistent with each other.

■ In addition to what has heretofore been said, we think there is another ground upon which the judgment of the trial court may be sustained as to the greater portion of the amount thereby awarded to the respondents. As has heretofore been shown, the trial court found that the tooling work and changes in dies, hereinabove referred to, were made necessary through conditions over which respondents

had no control; that they came about either through imperfections in the material supplied by the appellants or else because of changes which appellants themselves ordered; and that the greater portion of such work was performed by respondents in pursuance of agreements entered into *subsequent* to the execution of the written agreement.

It is universally understood and accepted that the parol evidence rule does not prohibit proof by parol of an agreement of parties made subsequent to the execution of a written agreement by the same parties, even though such oral agreement may have the effect of adding to, changing, modifying, varying, or qualifying the terms of the written agreement. 32 C. J. S. 1008, Evidence, § 1004; 20 Am. Jur. 1016, Evidence, § 1163; *Andersonian Inv. Co. v. Wade*, 108 Wash. 373, 184 Pac. 327; *Tri-State Terminal Co. v. Washington Wheat Growers' Ass'n*, 134 Wash. 519, 523, 236 Pac. 75, 77.

In the *Andersonian Inv. Co.* case, *supra*, we said:

"When, therefore, the acts and conduct of the parties to a written agreement, occurring subsequent thereto, show an addition to or a modification of a written agreement, or the acts of one party, acquiesced in by the other, show such modification, no rule of evidence precludes a showing of the entire transaction, even if a part thereof is a parol contemporaneous agreement adding to, varying, or modifying a written agreement. The parol evidence rule is intended to prevent, not to promote frauds, and it would be a fraud to allow a party to a written agreement to enforce it as written when he has agreed not to do so, where the other, on the faith of the agreement, has acted thereon to his detriment."

The facts of this case, as found by the trial court, and as supported by the evidence, bring it within the principles above stated.

The judgment is affirmed.

JEFFERS, C. J., BEALS, MALLERY, and HILL, JJ., concur.