Nell E. SPRADLIN, Plaintiff in Error,

v.

AMERICAN TRAVELERS INSURANCE COMPANY, a Corporation, Defendant in Error.

No. 39065.

Supreme Court of Oklahoma.

Sept. 26, 1961.

Rehearing Denied Nov. 28, 1962.

Foliart, Hunt & Shepherd, Oklahoma City for plaintiff in error.

Leslie L. Conner, Oklahoma City, for defendant in error.

BLACKBIRD, Vice Chief Justice.

Defendant in error, hereinafter referred to as plaintiff, commenced this action against plaintiff in error, hereinafter referred to as defendant (and others not parties to this appeal, and unnecessary to name), seeking a money judgment on a promissory note, dated October 8, 1956, in the amount of $3,-500, and foreclosure of a real estate mortgage, dated July 28, 1955, allegedly securing it, both of which were executed by said defendant.

Plaintiff's petition alleged that the note sued upon was executed and delivered to evidence the same debt as an earlier note executed and delivered by defendant to plaintiff, on the same date as the subject real estate mortgage, but thereafter " * * misplaced, or lost, or destroyed * * *". Copies of the note and mortgage were attached to the petition as Exhibits "A" and "B". Exhibit A described the note's consideration only as: "* * * for value received, * * *." The petition explained this term however by alleging that the consideration for the note and mortgage was actually the issuance and delivery to defendant of certain certificates for shares of stock in plaintiff corporation.

Defendant's amended answer did not deny her execution of the note and mortgage, but alleged that the note was a renewal note, which superseded, or took the place of, an original one theretofore executed and delivered by defendant to plaintiff, on July 28, 1955, when the mortgage was executed and delivered. In said pleading, defendant further alleged, in substance, that said original note was delivered to Joe Norvell, the plaintiff corporation's former Secretary, after he had recurrently attempted, beginning in January, 1954, to sell defendant's husband, G. D. Spradlin, some of said corporation's stock for cash—and failing in this—later offered to deliver it in exchange for the note, with the oral agreement that said note would not be "called" for payment as long as Spradlin held the stock. Defendant further alleged that she and her husband discussed this offer between themselves, and decided to accept it on condition that the stock be issued "in their joint names", and plaintiff would not require payment of the note until the stock was sold; that pursuant to said agreement, Mr. Spradlin instructed Norvell to prepare the necessary papers to consummate the deal; that the mortgage was given to secure the note because of Norvell's

representation that the State Insurance "Examiner" would require it, but that said mortgage would not be recorded; that when the original note, which was nonnegotiable, became due on July 28, 1956, plaintiff, in accord with the parties' agreement, requested only that the interest thereon be paid, and that the renewal note be signed; that plaintiff breached its agreement both by recording the mortgage, and demanding payment of the note on October 8, 1957, despite the fact that the stock has not been sold, but remains in defendant's and her husband's names; that, because said event —the sale of the stock—has not occurred, defendant is not yet liable for payment of the note, and plaintiff's action is premature.

In plaintiff's amended and verified reply, it denied, in substance, that it ever made the oral agreement alleged in defendant's answer, and that Norvell, or anyone else, could bind it by any such agreement. It also denied defendant's allegations that G. D. Spradlin was acting as agent for his wife in the transaction, and alleged that, since nothing concerning the agreement alleged by defendant is contained in the note and mortgage sued upon, defendant was " * * * estopped to raise said alleged defense."

At the trial before a jury, plaintiff introduced the note and mortgage in evidence as well as the typewritten "stock subscription" sheet for the stock in question. The latter bears defendant's signature as "Purchaser" and was witnessed by "J. D. Norvell" (the same person as "Joe Norvell"). There also appears on the sheet a notation that the stock was to be issued in the name of "G. D. Spradlin and Nell E. Spradlin as Joint Tenants, The Survivor To Take All."

Before resting its case, plaintiff also established by the testimony of its president, G. G. Antene, that J. D. Norvell was secretary of the plaintiff corporation at the time the note sued upon was executed and delivered, but that in April, 1957, when the witness became its president, all of said corporation's former officers were replaced.

This witness further testified that the signature on the subscription sheet directing how the stock was to be issued was Norvell's; that the subject note and mortgage were discovered in a search (made after the witness became its president) of the corporation's records, for its assets and liabilities; and that after their discovery, the note and mortgage were filed of record in the Carter County Clerk's office. Antene also testified that searching plaintiff's records revealed that a year's interest on the original note of July 28, 1955, had been paid. He substantiated defendant's allegations that the note sued upon was given as a "renewal" note. This witness further testified that in the latter part of September, 1957, he wrote "them" (the Spradlins) that the note sued upon would be due and payable, with interest, in October; that the Spradlins sent plaintiff a check attempting to pay (instead of both principal and interest) only the annual interest prescribed in the note " * * * with a lot of stipulations written on it and a letter * * * " of explanation; that this check was returned to defendant " * * * because we couldn't accept it." In this connection, a part of the witness' examination is as follows:

"Q. Is it your testimony that the agreement which Mrs. Spradlin alleges took place between her and the company's representative (Norvell) was not brought home to you at any other time than the time that you received this letter? A. That's correct."

On defendant's behalf, certain portions of a deposition previously taken from Norvell were read into the record. In the portions of it that were not objected to, Norvell deposed that he became associated with plaintiff corporation as one of its "original organizers" in 1953; that he was its first secretary, and continued to be associated with it until April, 1957; that he spent an "appreciable" amount of his time (while with plaintiff) in selling, and/or supervising the sale of, its stock; that he first talked to defendant's husband, Mr. Spradlin, about

purchasing some of said stock when plaintiff was first organized as a mutual company, and also after it was converted to a capital stock company; and that he handled the negotiations which resulted in the mortgage, though the matter was discussed by all of plaintiff's officers.

Over plaintiff counsel's objections, on the ground, among others, that it was inadmissible as parol evidence calculated to show a variance, or contradiction, of the terms of the note and mortgage (as written contracts), the trial court first permitted the following portion of Norvell's deposition to be read in evidence:

"Q. Under what circumstances was the defendant's note delivered?

*  *  *  *  *  *

"A. Well, this was a little different transaction. Most of the stock we sold—we would sell the stock and get a check and that was it. This transaction was handled a little differently because Mr. Spradlin had some property here that we took a mortgage on in exchange for the stock. Now the discussion we held as officers of the company and the reasons we did it were two-fold, one of which was that we were attracting—we were a young company and we thought we were attracting to our stockholder's group a definite asset in Mr. Spradlin as a stockholder and secondly we were making a good investment as the mortgage was to draw 4% interest. We made this sort of a deal because we felt that Mr. Spradlin was a key man, that he would attract and did attract several very substantial investors to the company and, therefore, we—the deal was a little different from anything else we had entered into and so it was the subject of quite a bit of discussion on our part. We had the feeling that *as long as Mr. Spradlin remained a stockholder in the company that our mortgage and our note was a very good investment,* however, we did discuss the fact that *at any time that he should sell his stock*

*why then we'd have to look upon this as just a straight loan* and scrutinize it again. Actually, *as long as he was a stockholder in our company we felt like that there would be no point in our calling the note* or making any other sort of arrangements." (Emphasis ours.)

Thereafter, the court allowed Mr. Spradlin, over objection of plaintiff's counsel, to testify that he served as his wife's agent in the stock transaction; that she owns a "few pieces of property", and that he advises with her about how to handle it, and, after she decides upon what to do, he handles the details of carrying out her decision; that defendant executed the subject note, and asked him to deliver it to plaintiff company on the basis of the following representations made by Norvell:

"*  *  *, (he)—said the company was right at the moment in bad shape because they had to issue some more stock. Later on they were going to have a big new issue outlay and it was going to be sold at a higher price and all their problems would be over but right now they had to issue some new stock or quit selling their policies. And if we would do them the favor of subscribing—sign this stock subscription, and giving them a note, that they would issue us this stock. But the note wouldn't be a real note, it wouldn't be a real obligation on us, or Mrs. Spradlin, to pay until such time as—as they had their big new stock sale and they got that money in and then they would sell this stock that we had. When they sold the stock that we held, or part of it, enough of it to make the—to pay the note, then it would be a real note and it was—we had to pay it at that time."

Other objected-to portions of Spradlin's examination were, in part, as follows:

"Q. *  *  *—what was the reason that the company was willing to make this offer, *  *  *? A. The way I understood it, we were in effect sort of lending *  *  * this insurance com-

pany, some credit. We were doing them a favor on a temporary basis. In return for that, later on when the stock went up and they sold the new stock, they wouldn't sell all of our stock to pay off the thirty-five hundred dollars, they'd start at some price where we would have a little stock left. * * * We'd have no cost in that part of the stock that was left.

"Q. Did Mr. Norvell subsequently deliver to you a note and mortgage for Mrs. Spradlin to sign? A. Yes.

*     *     *     *     *     *

"Q. He fixed up the papers and I took them out to the house and Mrs. Spradlin signed them. * * * A. * * * I explained the whole thing to her and told her I thought it was the kind of thing that she should do be-. cause there was no risk in it and she'd have a little bit of stock for nothing. She said, 'Well, Okay * * *.'

"Q. And did you subsequently see Mr. Norvell for the purpose of delivering the note and the mortgage to him? A. Well, he came to my office. * * *

"Q. And what did you say to him at that time? A. Well, I went through the entire agreement again. That here was the note and mortgage and that I would give it to him at that time on the understanding and with the agreement that the mortgage would not be recorded, * * * and that the note would not be a real obligation on us to pay until such time as they sold a sufficient amount of their stock that we were holding to pay the thirty-five hundred dollars.

*     *     *     *     *     *

"Q. Now, this note that they are suing on here, is dated October 8, 1956. Will you please explain, if you can, where the note is that was dated July 28, 1955? A. Well, * * *—that was the original note and it was torn up in the company's office. * * * a

year or so went by and they had not yet sold the stock they were holding, although I had requested that that be done. They hadn't been able to sell the stock. * * *

*     *     *     *     *     *

"Q. Did anyone in the company call you, * * * in connection with your wife's original note? A. Yes.

*     *     *     *     *     *

"A. Mr. Norvell.

"Q. What did he say? A. He asked me if we would mind giving the company a new note and paying the interest on the old note *so it wouldn't look bad on their books.*

"Q. Did you discuss that with your wife at that time? A. Yes. I did.

"Q. And what was her decision? A. She decided that we would go along and comply with the company's request.

"Q. Was a new note made? A. Yes. It was.

"Q. Who prepared it? A. The company.

*     *     *     *     *     *

"Q. Do you know who brought it to you? A. * * * Mr. Norvell.

"Q. (After you took the note home to your wife and she signed it) Did you take it back to them? A. Yes.

"Q. To whom did you hand it? A. I gave it to Mr. Norvell and Mr. Peoples, who was the treasurer at that time.

"Q. At the time you handed it to them, was anything said by you? A. * * * I * * *—went over the deal thoroughly with those two people and told them that this note was delivered to them on the same conditions and terms as the other note was. That is, * * *—we wouldn't really be obligated to pay that note until they sold that stock.

*     *     *     *     *     *

"Q. Do you still have the stock? A. I have it right over there.

*     *     *     *     *     *

"Q. Now, you heard Mr. Antene testify that he came into this company in April, 1957? A. Yes.

"Q. Mr. Spradlin * * *—did you have any conversation with Mr. Antene about the matters that occurred between you and Mr. Norvell in the preceding years. A. Well, I explained it very carefully and in detail to Mr. Antene on the telephone as soon as he called me.

*   *   *   *   *   *

"Q. When was this conversation between you and Mr. Antene? A. * * * in October of 1957." (Emphasis ours.)

At the conclusion of Mr. Spradlin's testimony, plaintiff moved to strike all of it, and the trial judge sustained said motion remarking as he did so:

" * * * I feel that at least a portion of it was incompetent because of the incompetency of the witness to testify as the husband of the defendant. But I think possible all of it is incompetent as an attempt to vary the terms of a written instrument and the motion will be sustained on that ground."

Thereupon, after counsel announced that defendant had no further evidence to introduce, and both parties had rested, the trial judge instructed the jury to return a verdict for the plaintiff " * * * because of the lack of a fact question * * *".

After a verdict was returned in accord with said instruction, judgment was accordingly rendered for plaintiff. After defendant's motion for a new trial was overruled, she perfected the present appeal.

In the second proposition defendant asserts for reversal, she says, in part, that the evidence "offered" by her " * * * raised a question for the jury * * *". However, the separate, and singular, question of whether the trial court erred in directing a verdict, is ordinarily determined on the basis of the evidence *introduced,* rather than that which has only been offered, but excluded, and/or stricken. In such a determination—considered separately and independently of any alleged error in admitting it—the competence, as distinguished from the probative force, of such evidence, is ordinarily not at issue, or involved. Thus, in passing upon the correctness, in the present case, of the trial court's conclusion that the evidence presented no "fact question", we would look only at plaintiff's evidence, plus the deposition of Joe E. Norvell, and the unstricken part of G. D. Spradlin's testimony. Then we would analyze it in the light of the test which governs trial courts in such matters, that is, the correct answer to the following question: Upon considering that part of said evidence favorable to defendant, together with the reasonable inferences to be drawn therefrom, does it tend to prove her defense? Upon such consideration of the evidence in this case, this question must be answered in the affirmative. There is the clear showing in portions of it that payment of the principal of the note was not to be compulsory, as long as Mr. Spradlin remained a holder of the stock, notwithstanding the apparently conflicting promise contained in the note itself to pay said amount "On or before October 8, 1957 * * *". This conclusion renders manifest the error of the trial court in directing the verdict, and entering judgment in plaintiff's favor, and in thereafter overruling the motion defendant filed for a new trial, asserting such action as error. The latter error alone is sufficient ground for reversing the trial court, and ordering a new trial.

However, in anticipation of possible error in rulings on evidence at a new trial, since both plaintiff's counsel and the trial judge, if consistent, would obviously consider part of the above-referred to evidence—particularly the deposition of Joe D. Norvell—as incompetent under the parol evidence rule, and because said rule has been held to be a part of the substantive law, rather than merely a rule of evidence, we think it appropriate to deal with the issue raised by defendant's objection to the court's striking of her husband's proffered testimony on that ground.

As we view the promissory note and mortgage in the present case, neither or both were the "written contract" whose variance or contradiction by parol evidence is forbidden by the parol evidence rule, or by Tit. 15 O.S.1951 § 137. Those instruments were executed merely as a part of the parties' broader, and more comprehensive, oral agreement for the issuance of stock in plaintiff corporation to the Spradlins. Plaintiff's pleadings and evidence alone show that. Therefore, under all of the better reasoned authorities, parol evidence to establish the entire agreement was admissible. See Home State Bank of Hobart v. Sullins, 198 Okl. 314, 178 P.2d 86, 87, 88; Farmers & Merchants Nat. Bank v. Lee, 192 Okl. 9, 132 P.2d 931, 933; Oklahoma Natural Gas Corp. v. Douglas, 170 Okl. 284, 39 P.2d 578, 101 A.L.R. 144. See also the excellent and comprehensive discussion in Buyken v. Ertner, 33 Wash. 2d 334, 205 P.2d 628. As to this and related subjects, see also the following annotations in A.L.R., Vol. 105, at page 1356; Vol. 70, at page 752; Vol. 54, at page 702; and Vol. 20, at page 421. In City Nat. Bank of McAlester v. Edwards, 100 Okl. 202, 229 P. 487, 488, this court held:

> "The rule which excludes parol evidence when offered to contradict or vary the terms, provisions, or legal effect of written instruments has no application to collateral undertakings or *cases in which the written instrument was executed in part performance of an entire oral agreement.*" (Emphasis ours.)

See also Edwards v. City Nat. Bank of McAlester, 83 Okl. 204, 201 P. 233. As we interpret the deposition of Mr. Norvell, the primary, or most important, part of the arrangement he made for plaintiff with the Spradlins, as far as plaintiff corporation was concerned, was not any money to be derived from such transfer of stock, but the fact that, as a result of it, plaintiff could represent to others that Mr. Spradlin was one of its stockholders. The situation presented here is not a true instance of a note to be paid out of a special, or particular, fund (Posey v. Citizens' State Bank, 93 Okl. 266, 220 P. 628), for, as we interpret the agreement, if the Spradlins sold the stock, or Mr. Spradlin ceased to be a stockholder, on or before the maturity date of the note, then it became a general, secured obligation, of its signer, the defendant, as it purported, on its face, to be. This case involves an oral contract in which only the debtor's obligation to pay was conditional. See 20 A.L.R. 440, supra. If the stock had not been sold by the note's maturity date (which contingent part of the parties' oral agreement was not written into the note or mortgage); then the principal of the note was not to become due until such a sale occurred. Thus, only a portion of the parties' total agreement was integrated in these two written instruments, the note and the mortgage. This is, we think, what the authorities have referred to as the "partial integration" exception to the parol evidence rule. See Buyken v. Ertner, supra; Mangini v. Wolfschmidt, Ltd., 165 Cal.App.2d 192, 331 P.2d 728, 733; and 8 Am.Jur., "Bills and Notes", sec. 1065. Furthermore, the circumstances in evidence furnish a very reasonable explanation for no attempt being made to reduce the entire agreement to writing, as additions to these commercial instruments. In this connection, see Crone v. Amado, 69 Ariz. 389, 214 P.2d 518, and Restatement of the Law, Contracts, Vol. 1, sec. 240, pages 337 and 338.

Nor do we think the trial judge was correct in his belief that a portion of Mr. Spradlin's testimony "was incompetent" because of his " * * * incompetency * * * to testify as the husband of the defendant." Spradlin's testimony concerning a transaction in which he acted as agent for his wife (if the jury believed this to be a fact) would be, in terms of the statute, an exception to the general incompetency of spouses to testify for or against each other. See Title 12 O.S.1951 § 385, paragraph 3. There is no merit in plaintiff counsel's inference that defendant's pleadings were insufficient to permit

proof of Mr. Spradlin's agency for the defendant, and that his testimony alone was insufficient as such proof. The rule that the "declarations" of an agent are not admissible to prove his agency does not apply to his testimony. In addition to Benham v. Selected Investments Corp., Okl., 313 P.2d 489, 493 (cited by plaintiff) see Munn v. Mid-Continent Motor Securities Co., 126 Okl. 241, 259 P. 249, and 2 Am.Jur., "Agency", secs. 445, 446.

In accord with the foregoing, the trial court's judgment overruling defendant's motion for a new trial, appealed from herein, is reversed; and this cause is remanded to said court with instructions to sustain said motion.

WILLIAMS, C. J., and WELCH, DAVISON, HALLEY, JOHNSON, IRWIN and BERRY, JJ., concur.

JACKSON, J., concurs in result.