[No. 17182.    Department Two.    September 19, 1922.]

# THE YOKOHAMA SPECIE BANK, LIMITED, *Appellant*, v. GEO. S. BUSH & COMPANY, INCORPORATED, *Respondent*.[1]

BAILMENT (4)—PLEADINGS (145, 149)—JUDGMENT ON PLEADINGS—CONVERSION BY BAILEE. Where a bank held bills of lading for goods consigned by seller to itself, with drafts on the buyer attached, and the buyer refused to receive the goods unless delivered without payment of the draft, and the bank delivered the bills of lading to defendant with instructions to surrender the bills to the carrier and hold the goods in storage, and defendant thereafter delivered the goods to the buyer without authority, because the bank had been refunded the amount it advanced on the draft, in an action by the bank against defendant for the conversion of the goods by such wrongful delivery, the admission in the pleadings that the shipper had refunded to the bank the amount advanced on the drafts, does not entitle the defendant to judgment on the pleadings; in view of the fact that the draft was still in possession of the plaintiff, and that defendant was not authorized to deliver the goods; since the refund to the plaintiff is not conclusive, but only evidence, that the contract of bailment is not enforcible, in view of the allegations and denials in the complaint and reply.

BAILMENT (4)—CONVERSION—DEFENSES—DELIVERY TO OWNER. The bailee cannot, as a general rule, set up want of title in the bailor as an excuse for failure to deliver the goods; and the exception to the rule that the bailee may justify by delivery to the true owner, resting upon estoppel and termination of the bailment, is not available unless it conclusively appears that the surrender was made upon a lawful claim of paramount title.

Appeal from a judgment of the superior court for King county, Griffiths, J., entered February 20, 1922, upon sustaining defendant's motion for judgment on the pleadings, dismissing an action for conversion. Reversed.

*Shank, Belt & Fairbrook,* for appellant.

*Grinstead & Laube,* for respondent.

[1]Reported in 209 Pac. 676; 212 Pac. 583.

PARKER, C. J.—The plaintiff bank seeks recovery of damages in the sum of $1,512, which it claims to have suffered as the result of a conversion by the defendant, Geo. S. Bush & Company, Incorporated, of 105 bags of mustard seed. Following the filing of the pleadings, consisting of the complaint, answer and reply, the defendant moved for judgment upon the pleadings; the stated ground of the motion being "that it appears upon the face of said pleadings that plaintiff is not the real party in interest, and that there is a defect of parties plaintiff." This motion was granted by the superior court, judgment of dismissal with prejudice being rendered against the plaintiff; from which it has appealed to this court.

While it seems necessary to notice the allegations, admissions and denials of the pleadings in considerable detail, we think it will presently appear that the problem to be solved is comparatively simple.

The allegations of the plaintiff's complaint, so far as necessary to be here noticed, are:

"III.

"That on or about August 6, 1918, the plaintiff delivered to the defendant bills of lading numbers 64 and 65 Steamship 'Africa Maru' from Kobe, Japan, for 50 and 55 bags respectively of mustard seed, said bills of lading representing the title to 105 bags of mustard seed, with the request that the said defendant store the same in a bonded warehouse under the name of the plaintiff.

"IV.

"That thereafter and on or about August 27, 1918, the defendant delivered the said bills of lading to the said carrier and received the said 105 bags of mustard seed and stored the same in the Seattle Warehouse Company for the account of this plaintiff and received as evidence of the title of said mustard seed warehouse receipt and contract of the said Seattle Warehouse Company No. 6.

"V.

"That thereafter and on or about September 21, 1918, the defendant converted the said 105 bags of mustard seed.

"VI.

"That the reasonable market value of said mustard seed on and about the said 21st day of September, 1918, was the sum of $1,512."

The defendant's answer denies, in substance, the above quoted allegations of paragraphs III to VI, inclusive, of the complaint, except as admitted in the affirmative defense, which defense alleges:

"I.

"That, on and prior to August 6, 1918, Abe Kobei & Co., Ltd., a corporation organized and existing under and by virtue of the laws of the Empire of Japan, was engaged in selling merchandise to Overseas Commercial Agency, a corporation organized and existing under and by virtue of the laws of the state of California; that, on and prior to August 6, 1918, as defendant is informed and therefore alleges the fact to be, said Abe Kobei & Co., Ltd., was indebted to the Overseas Commercial Agency in a sum in excess of fifteen hundred twelve dollars ($1,512), the amount of which indebtedness is unknown to defendant.

"II.

"That, in the spring of 1918, the Overseas Commercial Agency had purchased from Abe Kobei & Co., Ltd., about two hundred (200) tons of yellow mustard seed; that, in the spring or summer of 1918, said Abe Kobei & Co., Ltd., made a certain shipment, in partial fulfillment of said sale, consisting of one hundred five (105) bags of mustard seed, from Kobe, Japan, to Seattle, Washington, upon the steamer 'Africa Maru,' upon bills of lading numbered 64 and 65 of said voyage, which steamer arrived at Seattle with said shipment on or about the 12th day of July, 1918; that said shipment of one hundred five (105) bags of mustard seed was consigned to order of Abe Kobei & Co., Ltd., at

Seattle, with instructions to notify said Overseas Commercial Agency.

"III.

"That said Abe Kobei & Co., Ltd., upon making said shipment from Kobe, Japan, drew its draft on said Overseas Commercial Agency in the sum of fifteen hundred twelve dollars ($1,512), attached thereto the said bills of lading numbered 64 and 65 for said mustard seed, and deposited or delivered said draft and bills of lading with plaintiff, at Kobe, Japan, who accepted said draft in the ordinary course of its banking business and that thereupon, as defendant is informed and believes, plaintiff gave credit or paid said Abe Kobei & Co., Ltd., the said sum of fifteen hundred twelve dollars ($1,512).

"IV.

"That said draft and bills of lading were thereafter transmitted by plaintiff, in due course of business, to its branch at Seattle, Washington; that the Overseas Commercial Agency refused to pay the said draft when presented and refused to accept delivery of said shipment of mustard seed unless the same should be delivered to it without the payment of said draft, so that the purchase price of said merchandise could be credited by it upon the indebtedness due it from Abe Kobei & Co., Ltd.; and that thereupon, on or about the 6th day of August, 1918, the plaintiff, acting under authority from said Abe Kobei & Co., Ltd., delivered said bills of lading numbered 64 and 65 to defendant, together with the consular invoice thereon, with instructions to defendant to surrender said bills of lading, accept delivery from carrier of said shipment of mustard seed, and to store the same in warehouse; that thereupon defendant delivered said bills of lading to carrier, received delivery of said shipment of mustard seed and stored the same in warehouse at Seattle.

"V.

"That plaintiff, upon the refusal of the Overseas Commercial Agency to pay said draft, returned the same to Japan and that thereupon Abe Kobei & Co.,

Ltd., as drawer, paid to plaintiff the amount of said draft, with accrued interest and charges.

"VI.

"That defendant is informed and therefore alleges the fact to be that thereafter said Abe Kobei & Co., Ltd., sent a representative from Kobe, Japan, with power of attorney to act for it, and said representative, after arrival in the United States, orally agreed with the Overseas Commercial Agency to have said shipment of mustard seed released and delivered to Overseas Commercial Agency without payment of said sum of fifteen hundred twelve dollars ($1,512), or any other sum, in consideration that said Overseas Commercial Agency should accept said merchandise and credit the purchase price thereof upon the indebtedness due from Abe Kobei & Co., Ltd., to it.

"VII.

"That thereafter defendant, pursuant to said agreement, surrendered possession of said shipment of mustard seed to Overseas Commercial Agency."

The plaintiff's reply, omitting formal parts, reads as follows:

"Answering paragraph I of said affirmative defense it admits that on or prior to August 6, 1917, Abe Kobei & Co., Ltd., was engaged in selling merchandise to the Overseas Commercial Agency.

"Answering paragraph II of said affirmative defense it admits that in the spring of 1918, Abe Kobei & Co., Ltd., made a shipment of 105 bags of mustard seed from Kobe, Japan, to Seattle, Washington, upon bills of lading numbered 64 and 65 steamer 'Africa Maru,' which arrived at Seattle on or about July 12, 1918, consigned to the order of Abe Kobei & Co., Ltd., with instructions to notify the Overseas Commercial Agency, but has no knowledge or information sufficient to form a belief as to the truth of the other allegations of said paragraph, and therefore denies the same.

"Answering paragraph III of said affirmative defense, it admits the allegations thereof.

"Answering paragraph IV of said affirmative defense, it admits that thereafter the said draft and bills of lading were transmitted to the Seattle Branch of the plaintiff, and that the Overseas Commercial Agency refused to pay the draft or accept the delivery of the mustard seed except without payment of the draft, and that on or about the 6th of August, 1918, the plaintiff delivered the said bills of lading together with consular invoice thereon to the defendant with instructions to the defendant to secure the said mustard seed and place the same in its warehouse, and alleges that the defendant did receive the said bills of lading and stored the said mustard seed in its warehouse and issued to the plaintiff its warehouse receipts therefor.

"Answering paragraph V of said affirmative defense, the plaintiff denies that on the refusal of the Overseas Commercial Agency to pay the said draft that it returned the same to Japan, but admits that it has been refunded by Abe Kobei & Co., Ltd., the amount of the said draft.

"Answering paragraph VI of said affirmative defense, plaintiff alleges that it has no information or knowledge sufficient to form a belief as to the truth of the allegations therein contained, and therefore denies the same.

"Answering paragraph VII of said affirmative defense, plaintiff alleges that it has no knowledge or information sufficient to form a belief as to the truth of the allegations therein contained, and therefore denies the same."

This, it seems to us, is simply a case of a bailee (the defendant Geo. S. Bush & Company, Incorporated) seeking to justify its act in delivering goods held by it as bailee to one other than its bailor (the plaintiff bank), in violation of their contract of bailment. The trial court held in effect that the admitted facts in the pleadings show that the defendant was justified in so violating the terms of the contract of bailment; apparently upon the theory that the plaintiff is admittedly neither the owner of, nor has such interest in, the

goods as to entitle it to sue the defendant to recover the goods or their value. We are not able to agree with this view of the pleadings. The admitted fact that the amount of the draft has been refunded by Abe Kobei & Company, Limited, to the plaintiff seems to be the controlling inducement to the trial court's decision. The more important facts remain, however, that the draft is still in the possession of the plaintiff, that the defendant was not authorized to deliver the goods to the Overseas Commercial Agency, and that the contract of bailment is still enforcible as between the plaintiff and the defendant, according to the allegations and denials of the plaintiff's complaint and reply. The fact that the amount of the draft has been refunded by Abe Kobei & Company, Limited, to the plaintiff does not conclusively negative the pleaded facts which show the continued enforcible existence of the contract of bailment. It may be that the refunding of the amount of the draft would constitute a proper item of evidence tending, with other evidence, to show that the contract of bailment is not now enforcible by the plaintiff, but that fact is not conclusive as against the plaintiff in view of the allegations and denials of its complaint and reply. We recognize that defendant, upon the trial of the merits of this case, may be able to show conditions which will justify its surrender of the mustard seed to the Overseas Commercial Agency, but that is quite a different matter from holding that the admitted facts in these pleadings conclusively show such legal justification for such delivery by the defendant. In the text of 3 R. C. L. 86 we read:

"It is the well settled general rule, supported by both public policy and reason, that a bailee cannot set up a want of title in the bailor as an excuse for his refusal to redeliver the bailment, or, as it is usually stated, he is estopped to deny his bailor's title. This

principle is legal, as distinguished from equitable, in its nature, and follows logically from a consideration of the contract of bailment, which necessarily admits the right of property in the bailor, and the obligation to return the article to him at the end of the term of bailment. In other words a bailee, when he receives the property by virtue of the bailment, legally admits the right of the bailor to make the contract of bailment. After this subservient relation of the bailee to the bailor in respect to the property is established, the law forbids him to dispute the title of the bailor.''

Under the early common law authorities, this estoppel was all but conclusive as against the bailee under all circumstances. The modern view recognizes certain exceptions and conditions under which the bailee may be justified in surrendering the bailed property to some one other than the bailor. The rule of such modern exceptions is well stated in 3 R. C. L. 88 as follows:

''The modern rule, as recognized in this country and in England, admits of numerous exceptions to the general principle of estoppel, chief of which is that it is a sufficient excuse for the nondelivery of personal property for the bailee to show that he has surrendered it to the rightful owner. The reasoning upon which the modern doctrine rests is, that the obligation of the bailee is to restore the property, or to account for it, and that he has, in legal contemplation, accounted for it when he has delivered it to one whose title and right of possession is paramount to that of his bailor. He may, in brief, if he choose, yield to a stranger claiming the property, by taking the risk of establishing the title thus recognized. Other exceptions to the general rule forbidding a bailee to deny his bailor's title arise where the bailee has been dispossessed of the subject-matter of the bailment by legal process, or where, although he retains possession of the bailed articles, he shows that he has been authorized to defend the title by the person in whom it is vested, or where the bailor

parts with his title during the bailment.  The various exceptions mentioned above demonstrate that the true ground on which a bailee may set up the *jus tertii* is that the estoppel ceases when the bailment on which it is founded is determined by what is equivalent to an eviction by title paramount.''

It seems quite clear to us that it does not conclusively appear upon the face of these pleadings that the defendant surrendered the bailed property to the Overseas Commercial Agency upon a lawful sustainable claim of paramount title by the Overseas Commercial Agency.  It may be that the evidence which may be introduced upon a trial upon the merits of this action will ultimately warrant a final judgment in favor of the defendant upon that theory; but we are of the opinion that these pleadings do not now warrant a final judgment in favor of the defendant.

The judgment is reversed, and the cause remanded for further proceedings.

HOLCOMB, MAIN, MACKINTOSH, and HOVEY, JJ., concur.

## ON REHEARING.

[*En Banc.*  February 3, 1923.]

PER CURIAM.—Upon a rehearing *En Banc,* the majority of the court adhere to the Department opinion. The judgment of the trial court is therefore reversed and the cause remanded for further proceedings.