[No. 3727–4–III.   Division Three.   July 21, 1981.]

*In the Matter of the Liquidation and Receivership of* PRIOR BROS., INC.

INTERNATIONAL HARVESTER COMPANY, *Appellant,* v. THE BANK OF CALIFORNIA, N. A., *Respondent.*

*Roland L. Skala, Weeks, Dietzen & Skala, James H. Kaufman,* and *Aitken, Schauble, Patrick & Neill,* for appellant.

*Dean A. Messmer* and *Bogle & Gates,* for respondent.

ROE, J.—In 1974, Prior Brothers, Inc. (PBI) began financing its farming operations through the Bank of California, N. A. (Bank). The Bank's loans were secured by PBI's equipment and included any after–acquired property. On March 22, 1974, the Bank filed a financing statement perfecting its security interest. In April 1976, PBI needed a new tractor to use in its potato farming operation, as its tractor had broken down. A. Fred Prior, the president of PBI, contacted Jim Castle, a salesman at the International Harvester (IH) dealership in Sunnyside. On April 8, 1976, after considering various tractors, Prior signed a retail installment sales contract for a model 1066 IH tractor. In an affidavit Castle explained that Prior signed the contract "[i]n accordance with our customary practices," but that Prior took delivery of the tractor on approval and if PBI

decided to purchase the tractor, it could do so by informing IH of its intention and sending a $6,000 down payment. Castle's recital of the arrangement is confirmed by Prior. The tractor was physically delivered to PBI sometime after April 8. On April 22, 1976, IH received a check for $6,000 from PBI. On April 27, 1976, IH filed a financing statement on the tractor.

Later, PBI went into voluntary receivership and its assets were ordered liquidated. On January 11, 1979, IH filed a complaint asking the court to declare its purchase money security interest[1] in the tractor had priority over the Bank's security interest. On December 13, 1979, IH moved for a summary judgment on its complaint. The trial court denied the motion and held the Bank's security interest had priority, as it was filed before IH's security interest,[2] and that IH had failed to perfect its security interest within the time period allowed by statute.[3]

---

[1]RCW 62A.9–107:

"A security interest is a 'purchase money security interest' to the extent that it is

"(a) taken or retained by the seller of the collateral to secure all or part of its price; or

"(b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used."

[2]RCW 62A.9–312(5):

"(5) In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4) of this section), priority between conflicting security interests in the same collateral shall be determined as follows:

"(a) in the order of filing if both are perfected by filing, regardless of which security interest attached first under RCW 62A.9–204(1) and whether it attached before or after filing;

"(b) in the order of perfection unless both are perfected by filing, regardless of which security interest attached first under RCW 62A.9–204(1) and, in the case of a filed security interest, whether it attached before or after filing; and

"(c) in the order of attachment under RCW 62A.9–204(1) so long as neither is perfected."

[3]RCW 62A.9–312(4):

"A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase

IH appeals. It argues this was a sale on approval, RCW 62A.2-326(1)(a),[4] PBI did not become a debtor[5] under the code until it had signaled its acceptance of the contract and made the down payment, and that it did not possess the tractor as a debtor until that time. Thus, it claims it had 10 days from April 22, 1976, the date it received PBI's down payment, to perfect its purchase money security interest. Since its financing statement was filed on April 27, 1976, 5 days after receipt of the down payment, it urges it did file within the 10 days allowed under section 9-312(4) and its security interest is thus prior to that of the Bank's.

Conversely, the Bank argues the sales contract signed by Prior on April 8, 1976, was the complete agreement between the parties and that the financing statement should have been filed within 10 days of April 8 in order to enjoy the protection of section 9-312(4).

█ This case was decided on a motion for summary judgment. Thus, our review is limited to deciding whether there are issues of material fact and whether judgment should have been entered as a matter of law. CR 56(c). Because the contract includes an entire agreement clause,[6]

---

money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter."

[4]RCW 62A.2-326(1) provides:
"(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is
"(a) a 'sale on approval' if the goods are delivered primarily for use, and
"(b) a 'sale or return' if the goods are delivered primarily for resale."

[5]RCW 62A.9-105(1)(d) provides:
"(d) 'Debtor' means the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts, contract rights or chattel paper. Where the debtor and the owner of the collateral are not the same person, the term 'debtor' means the owner of the collateral in any provision of the Article dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires;"

[6]"ENTIRE AGREEMENT: Purchaser agrees that this contract including the ADDITIONAL PROVISIONS PRINTED ON THE REVERSE SIDE hereof, which [he] has read and

the Bank argues parol evidence was inadmissible to show the contract was one on approval. However, the trial court must hear all extrinsic evidence to determine whether the parties intended the agreement to be a final integration before it can apply the parol evidence rule. *Barovic v. Cochran Elec. Co.,* 11 Wn. App. 563, 565, 524 P.2d 261 (1974); *Diel v. Beekman,* 1 Wn. App. 874, 880, 465 P.2d 212 (1970); *cf. Nashem v. Jacobson,* 6 Wn. App. 363, 492 P.2d 1043 (1972) (no contention collateral agreement existed).

Parol evidence is generally inadmissible to contradict or vary the terms of a writing which is a complete integration of the agreement between the parties. *Buyken v. Ertner,* 33 Wn.2d 334, 205 P.2d 628 (1949); *Trethewey v. Bancroft–Whitney Co.,* 13 Wn. App. 353, 356, 534 P.2d 1382 (1975). However, parol evidence may be admitted to determine the issue of the validity of a contract or to impeach its creation. *Bond v. Wiegardt,* 36 Wn.2d 41, 48, 216 P.2d 196 (1950); *Reiner v. Crawford,* 23 Wash. 669, 63 P. 516 (1901). Thus, parol evidence may be admitted to show there is a condition precedent to the contract coming into existence. *Nelson Equip. Co. v. Goodman,* 42 Wn.2d 284, 288, 254 P.2d 727 (1953); *Reiner v. Crawford, supra.*

Here, if the trial court finds there was a condition precedent to the formation of the contract between IH and PBI, *i.e.,* that the sale was on approval, the question becomes whether the sale on approval terms contradict the written agreement. The contract signed by PBI is dated April 8, 1976. The first payment scheduled to be made under the contract terms was not due until December 1, 1976. Thus, even if PBI took a reasonable period of time to accept the contract, the payment terms would not be varied by an acceptance date later than the date the contract was signed.

The Bank argues the parol evidence rule applies in

---

to which he agrees, contains the entire agreement relating to the installment sale of said property and supersedes all previous contracts [or] agreements between purchaser and seller relating to the order or sale of said property, except as to any written agreements between purchaser and seller concerning warranty. This contract is not binding upon seller, unless signed by the manager of seller, or owner."

this case for two reasons: (1) because the contract uses the word "hereby,"[7] which the Bank contends means "at this time," and (2) because of RCW 62A.2–202.[8] As to its first argument, we note the word "hereby" has been defined as "[b]y means of this;" not "now—as of this date." *Sommerfeldt v. Union Painting Co.,* 57 Wn.2d 250, 255–56, 356 P.2d 601 (1960). Its use in the conditional sales contract does not resolve any ambiguity as to the effective date of the contract, and parol evidence is thus admissible to show the contract's effective date.

As between parties to the contract, RCW 62A.2–202 states parol evidence may not be used to contradict terms of a final written expression. The code is silent as to the effect on third parties and the parol evidence rule. Precode law is then applicable. 1 R. Anderson, *Uniform Commercial Code* § 2–202:23 (1970); RCW 62A.1–103. The general rule is that third parties are not bound by, nor may they use, the parol evidence rule against parties to a writing. *Witenberg v. Sylvia,* 35 Wn.2d 626, 629, 214 P.2d 690 (1950); *State ex rel. Wirt v. Superior Court,* 10 Wn.2d 362, 368, 116 P.2d 752 (1941).

In *Ransom v. Wickstrom & Co.,* 84 Wash. 419, 146 P. 1041 (1915), Wickstrom & Co. entered into a contract with

---

[7]The contract between IH and PBI provided:

"Purchaser hereby purchases, and seller hereby sells, subject to all terms, conditions and agreements contained herein, including the ADDITIONAL PROVISIONS printed on the REVERSE hereof, the following described property, delivery, inspection and acceptance of which are hereby acknowledged by the purchaser."

[8]RCW 62A.2–202:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

"(a) by course of dealing or usage of trade (RCW 62A.1–205) or by course of performance (RCW 62A.2–208); and

"(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

J. E. Wickstrom whereby he would act as the company's agent for the sale of a car. The contract provided a bill of sale would issue vesting title to the car in the agent to facilitate the disposition of it. A bill of sale was made pursuant to the contract. Thereafter, the agent gave James a chattel mortgage on the car to secure a $200 loan. That same day, Ransom secured a personal judgment against the agent and caused an execution to be issued and levied by the sheriff upon the car. The company claimed ownership of the car. At trial, the agent was allowed to testify that the bill of sale was given to him pursuant to the original contract and solely to carry out its terms. After judgment for the defendant, plaintiff appealed, claiming the parol evidence rule prevented the agent from testifying to an oral agreement which varied the terms of the written and recorded bill of sale. The court stated:

> [I]t is a general rule that estoppels are mutual. Since the appellant would be permitted, if he so desired, to show by parol the real agreement as against the parties regardless of the written contract, the parties to the contract are not estopped as against the appellant also to show the real agreement by parol. . . . [W]e are constrained to hold that, inasmuch as this contest arises between a party to the contract and a stranger thereto, parol evidence was admissible on both sides to prove the real character of the transaction . . .

*Ransom v. Wickstrom & Co., supra* at 426–27. Exceptions to the rule are for third party beneficiary contracts and contracts which have been assigned. *Ransom v. Wickstrom & Co., supra* at 425. The instant case involves neither of these exceptions. Thus, the Bank may not take advantage of the parol evidence rule either to bar evidence of a condition precedent to the contract or to prevent an alleged modification of the contract between IH and PBI. *See also Vancouver Nat'l Bank v. Katz,* 142 Wash. 306, 313, 252 P. 934 (1927); *Godefroy v. Hupp,* 93 Wash. 371, 378, 160 P. 1056 (1916).

Thus, we hold parol evidence is admissible to show a condition precedent to the contract between IH and PBI

and remand for a determination whether the sale of the tractor was absolute or on approval. If the trial court finds the sale was absolute, *i.e.,* took effect on April 8, 1976, it was correct in granting judgment to the Bank, as IH filed its security interest more than 10 days after PBI executed the contract. If, however, the trial court finds there was a sale on approval, with acceptance of the contract not occurring until April 22, 1976, it must then decide when PBI became a debtor in possession of collateral in order to determine when the 10–day grace period of section 9–312(4) had run. For the remainder of this opinion, we assume the sale between PBI and IH was a sale on approval accepted on April 22, 1976.

A purchase money security interest in collateral other than inventory has priority over other security interests in the same collateral if it is perfected within 10 days of when the "debtor receives possession of the collateral." RCW 62A.9–312(4). We do not believe PBI became a debtor in possession or the tractor collateral until it accepted the conditional contract of sale on April 22, 1976.[9] Thus, IH's financing statement was timely filed on April 27, 1976.

██ A security interest is

an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (RCW 62A.2–401) is limited in effect to a reservation of a "security interest".[10]

---

[9]Because he may never approve the sale, a conservative and cautious prospective purchaser of goods taken on approval might not wish a financing statement filed upon delivery in which he is listed as a debtor and which could conceivably cover all after–acquired property. RCW 62A.9–404, which allows the debtor to demand a termination statement, is hardly an adequate answer.

[10]RCW 62A.2–401(1) provides that when a seller retains title, the interest of the seller is limited to retention of a security interest. However, this article 2 security interest terminates when the debtor is in possession of the goods. RCW 62A.9–113; J. White & R. Summers, *Uniform Commercial Code* 898 (2d ed. 1980).

RCW 62A.1–201(37). A sale on approval,[11] which gives the purchaser the right to use and the option to purchase after a reasonable period of time, is a bailment. *McGinness v. Gossman,* 64 Wn.2d 363, 391 P.2d 967 (1964); W. Raushenbush, *Brown on Personal Property* § 10.5, at 234 (3d ed. 1975). In a bailment, title to the goods delivered remains in the bailor, while the bailee has possession only. W. Raushenbush, *Brown on Personal Property* § 10.5, at 228 (3d ed. 1975); *see Yokohama Specie Bank, Ltd. v. Geo. S. Bush & Co.,* 121 Wash. 272, 209 P. 676, 212 P. 583 (1922).

Thus, a vendee on approval (such as PBI) owes an obligation to either buy the property subject to the sale or to reject it within a reasonable time. A sale on approval may appear to be a security interest under article 9. However, article 9 applies only to "any transaction . . . which is *intended* to create a security interest . . ." (Italics ours.) RCW 62A.9–102(1)(a). Attachment, which is evidenced by intent and which occurs (1) when the parties agree that it attaches, (2) when value is given, and (3) when the debtor has rights in the collateral, is necessary. RCW 62A.9–204(1); *Kreiger v. Hartig,* 11 Wn. App. 898, 900, 527 P.2d 483 (1974). Here, PBI purported to grant IH a security interest in the tractor under the terms of the contract; thus, there was agreement subject to the condition precedent of approval. Value[12] was given by PBI when it sent IH the down payment of $6,000.

The third element necessary to show attachment is

---

[11]See footnote 4, *supra.*

[12]Value is defined in RCW 62A.1–201(44) as: "Except as otherwise provided with respect to negotiable instruments and bank collections . . . a person gives 'value' for rights if he acquires them

"(a) in return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon and whether or not a charge–back is provided for in the event of difficulties in collection; or

"(b) as security for or in total or partial satisfaction of a preexisting claim; or

"(c) by accepting delivery pursuant to a pre–existing contract for purchase; or

"(d) generally, in return for any consideration sufficient to support a simple contract."

that the debtor have rights in the collateral. Collateral is "property subject to a security interest . . ." RCW 62A.9–105(1)(c). Here, until PBI accepted the contract by approving the sale, the tractor was not subject to a security interest and thus was not "collateral" until that time.

The final consideration in determining whether IH may rely on the priority of section 9–312(4) is when did PBI become a "debtor in possession" of the tractor. There are two lines of cases which consider this question in applying section 9–312(4). We believe that *Brodie Hotel Supply, Inc. v. United States,* 431 F.2d 1316 (9th Cir. 1970), and its progeny, which focus on the time the debtor/creditor relationship arose, is the better statement of the law.

In *Brodie,* Lyon took possession of restaurant equipment belonging to Brodie in June 1964, but did not execute a chattel mortgage to secure its unpaid purchase price until November 12, 1964. Brodie gave Lyon a bill of sale on that day but did not file a financing statement covering the equipment until November 23, 1964. Meanwhile, on November 2, 1964, Lyon borrowed money from the National Bank of Alaska, using the equipment as security for the loan. The bank filed a financing statement on November 4, 1964, and assigned its interest to the Small Business Administration (SBA). In a priority dispute between Brodie and the SBA, the question was when did Lyon become a debtor in possession of the equipment. The court held Lyon became a debtor on November 12, 1964 when he became obligated to pay the purchase price. "Until that obligation came into being, Lyon was not Brodie's debtor with power to mortgage the restaurant equipment as collateral for the unpaid purchase price." *Brodie Hotel Supply, Inc. v. United States, supra* at 1318. The court noted Lyon might have been liable for reasonable rental of the equipment or its return, but he did not owe performance of any obligation until November 12, the date on which he executed the chattel mortgage in Brodie's favor and Brodie gave him a bill of sale. Thus, Lyon was not a "person who owes payment or other performance of the

obligation secured," RCW 62A.9–105(1)(d), until the sales transaction was completed.

The Ninth Circuit refined the *Brodie* holding in *In re Ultra Precision Indus., Inc.,* 503 F.2d 414 (9th Cir. 1974). On March 3, 1967, Ultra executed a chattel mortgage on its after–acquired property in favor of National Acceptance Corporation. On April 30, June 30, and August 7, 1968, Ultra accepted delivery of three machines from Wolf Machinery Co. The agreement between Wolf and Ultra allowed Ultra to test the machines for a reasonable period. Ultra accepted two of the machines and executed a security agreement covering them on July 31, 1968; this security agreement was assigned and a financing statement filed on August 5, 1968. The third machine was accepted and a security agreement executed on October 23, 1968; the financing statement was filed on October 30, 1968. Ultra later declared bankruptcy. National asserted its priority in the three machines under the security agreements executed in 1967. Wolf argued it had perfected its purchase money security interest in the machines by filing within the 10 days allowed by section 9–312(4).

The issue again was when did Ultra become a debtor in possession of the collateral. National contended Ultra became a debtor when it received physical delivery of the machines. Wolf claimed Ultra was not a debtor until the terms of the proposed sale had been met and a security agreement executed and delivered. The court agreed with Wolf's position. Ultra did not become a debtor until it executed and delivered the security agreements, which occurred after it had tested the machines and accepted them. Before that time,

> Wolf held no definitive security interest in the machines which could be perfected by the filing of a Financing Statement, and . . . Ultra held no assignable legal interest in the machines which could fall into the grasp of National's after–acquired property security clause.

*In re Ultra Precision Indus., Inc., supra* at 417. In both *Brodie* and *Ultra,* the debtor had possession of the collat-

eral before the sale of the goods was complete, *i.e.*, before there was acceptance of the contract of sale. In both cases, the court looked to the time at which the relationship between the parties became that of debtor/creditor to trigger the grace period of section 9–312(4). In the case at bench, the relationship between PBI and IH was in the first instance bailor/bailee; it did not become debtor/creditor until PBI accepted the tractor and tendered the down payment. Had PBI never approved the contract, it would never have become a debtor. *See also Commerce Union Bank v. John Deere Indus. Equip. Co.,* 387 So. 2d 787 (Ala. 1980).

Some courts have held the critical inquiry under section 9–312(4) is when the debtor received *possession* of the collateral. In *James Talcott, Inc. v. Associates Capital Co.,* 491 F.2d 879 (6th Cir. 1974), Getz gave Talcott a security interest in after–acquired property which was filed on December 12, 1968. On February 17, 1969, Getz took delivery of a tractor from Highway Equipment Co. On February 25, 1969, Getz signed a lease agreement with an option to purchase on the tractor. A financing statement covering this tractor was filed on March 3, 1969. The lease/option agreement provided the lease dated back to the date of first possession. A second tractor was leased under similar terms; the lease was signed on April 22, 1969, and the financing statement filed on April 28, 1969. On October 27, 1969, Getz exercised the options and signed security agreements on both tractors. In a subsequent dispute between Talcott and Associates, the assignee of Highway, the court held Talcott's security interest had priority. Under the lease agreements, Getz owed an obligation to Highway on the date he received possession under the lease, not the date on which he signed the leases. In distinguishing *Brodie,* the *Talcott* court found this difference "critical."

In *In re Automated Bookbinding Servs., Inc.,* 471 F.2d 546 (4th Cir. 1972), Automated had signed a chattel mortgage in favor of Finance Company of America (FCA), which included an after–acquired property clause, on November 20, 1968. FCA filed a financing statement on November 21,

1968. On January 30, 1970, Automated contracted to buy equipment from Hans Mueller Corp. (HMC), which retained a purchase money security interest in the equipment. The equipment was shipped in crates, which arrived at Automated between May 26 and June 2, 1970. Installation was completed sometime between June 13 and June 19; Automated acknowledged delivery and satisfaction on June 18, 1970. HMC filed a financing statement on June 15, 1970. In the dispute between HMC and FCA, the District Court held HMC had timely perfected its interest, finding the critical time to be the time of the installation (June 13–19), rather than the time of delivery (June 2); Automated did not receive possession until the tender of delivery terms were completed. *In re Automated Bookbinding Servs., Inc., supra* at 550. The Court of Appeals reversed, holding possession occurs when the debtor receives physical control of the collateral. *In re Automated Bookbinding Servs., Inc., supra* at 552. The court noted that tender of delivery under section 2–503 affects only the rights of the seller and buyer against each other.[13] Thus, "possession . . . is not dependent upon completion of tender of delivery terms which affect only the buyer and seller of the goods." *In re Automated Bookbinding Servs., Inc., supra* at 553. To hold otherwise would allow sellers to postpone indefinitely the filing requirement by failing to comply with a tender of delivery term and still take advantage of the grace period of section 9–312(4).

Such a concern is not present when the triggering event is acceptance of a sale on approval. The buyer must give seasonable notice of acceptance, RCW 62A.2–327(1)(b);

---

[13]This is an added distinction between *Automated* and the case at bench. Although sales on approval are also covered by article 2, there is a specific provision in RCW 62A.2–326 which relates to the rights of the creditors of those who buy on approval.

> Except as provided in subsection (3), goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.

RCW 62A.2–326(2).

RCW 62A.1–204(3). He may not postpone acceptance indefinitely. The seller, extending the privilege, has no authority to rescind once he has granted it; he has no security interest to protect until there has been acceptance. The *Automated* court recognized that a situation in which the debtor receives possession before the goods are sold to him and the security agreement is entered into might produce a different result. *See In re Automated Bookbinding Servs., Inc., supra* at 553 n.14 (distinguishing *Brodie*). We agree, as possession alone, without a concomitant obligation to perform, is not sufficient to call into play the provisions of article 9. Thus, it is when the purchaser of goods becomes a debtor, *i.e.*, owes an obligation secured by the collateral, that the time period allowed under section 9–312(4) begins to run. When the sale is one on approval, that event takes place at the approval of the contract. For other transactions, different events will trigger the running of the 10–day period. *See Rainier Nat'l Bank v. Inland Mach. Co.*, 29 Wn. App. 725, 737–38, 631 P.2d 389 (1981). (Execution of purchase agreement.)

Thus, if the trial court finds this was a sale on approval, until PBI approved purchase of the tractor, it was not a debtor under section 9–105(1)(d), nor was the tractor collateral under section 9–105(1)(c). Therefore, the 10–day period granted to purchase money secured creditors to file by section 9–312(4) did not commence to run until that time.

Judgment of the trial court is reversed and remanded for proceedings consistent with this opinion.

MUNSON, J., concurs.

McINTURFF, C.J. (dissenting)—I respectfully dissent from the views expressed by the majority. Although there is no language in the contract to support Harvester's "on approval" argument, I will, for the sake of argument, assume that parol evidence plus the foregoing facts of this case describe a sale on approval. Thus, two questions are

presented: (a) When did PBI become a "debtor", and (b) as a "debtor", when did PBI possess the "collateral"? The answer to these questions determines whether Harvester can take advantage of the PMSI priority outlined in RCW 62A.9–312(4).[14]

In answer to the first question, the majority maintains PBI became a debtor only after making the first down payment. The parol evidence relative to a sale on approval does not purport to establish the date upon which PBI became obligated to perform under the written contract.[15] Rather, it merely establishes the condition which must be set aside before the written contract legally obligates PBI to perform. Harvester admits the conditions were satisfied and that the contract became legally binding. The determination of the date PBI became obligated to perform, once the contract became legally binding, should be made by reference to the written contract.

The April 8, 1976, contract provides in pertinent part:

7. UNPAID BALANCE (Amount Financed)

(Total of 5 and 6)      21,151.76

8. FINANCE CHARGE      5,708.68

ANNUAL PERCENTAGE RATE 12%

---

[14]RCW 62A.9–312(4) provides:

"A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral *if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter*." (Italics mine.)

[15]The contract contained the following provisions:

"*Purchaser hereby purchases*, and seller hereby sells, subject to all terms, conditions and agreements contained herein, . . . the following described property, delivery, inspection and acceptance of which are hereby acknowledged by purchaser:
"...

"13. SECURITY INTEREST: In order to secure payment of the indebtedness contained herein, seller hereby retains, and purchaser hereby grants, a purchase money security interest under the Uniform Commercial Code in and to the above described property sold hereunder, . . .

"14. ENTIRE AGREEMENT: Purchaser agrees that this contract . . . which he has read and to which he agrees, *contains the entire agreement* relating to the installment sale of said property . . ." (Italics mine.)

9. Total of Payments                                    26,860.44
   (Total of 7 and 8)
10. Deferred Payment Price
    (Total of 3, 6 and 8)
Date Finance Charge Begins To Accrue              / /
    (*If different than contract date*)

(Italics mine.) From the foregoing, the date the finance charge began to accrue was the date of the contract, not acceptance. Hence, I would recognize PBI as the "debtor" within the purview of RCW 62A.9-105(1)(d),[16] as of April 8, 1976, the date the contract was signed.

With regard to the second question, the majority maintains the tractor could not become "collateral" until PBI indicated its approval by making the down payment. I differ from this reasoning and conclude Harvester failed to come within the requirements of RCW 62A.9-312(4), by not filing within 10 days of the date PBI received possession.

When goods are sold "on approval", the seller retains title. RCW 62A.2-327(1)(a).[17] The retention or reservation of title to goods by the seller, notwithstanding delivery of goods to the buyer, constitutes the reservation of the security interest. RCW 62A.1-201(37).[18] From a commercial viewpoint, it seems clear that Harvester retained an interest in the tractor to secure PBI's performance of an obligation which existed legally on the date PBI took possession of the tractor. RCW 62A.1-201(37). When the parties agreed to a "sale on approval", PBI was then legally obli-

---

[16]The term "debtor" is defined by the code as: "the person who owes payment or other performance of the obligation secured, . . ." RCW 62A.9-105(1)(d).

[17]RCW 62A.2-327(1)(a) states:
"(1) Under a sale on approval unless otherwise agreed
"(a) although the goods are identified to the contract the risk of loss and the title do not pass to the buyer until acceptance; . . ."

[18]RCW 62A.1-201(37) states in part: "The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (RCW 62A.2-401) is limited in effect to a reservation of a 'security interest'."

gated to: (1) use the tractor only in a manner consistent with the utilization thereof; (2) approve or disapprove of the tractor within a reasonable period of time; and (3) either (a) approve the tractor and perform the terms of written contract, or (b) disapprove the tractor and return it to Harvester. RCW 62A.2–327(1)(a)–(c). Hence, Harvester's reservation of title was a device to secure PBI's obligation to return the tractor should the tractor not be approved. While it is true that RCW 62A.2–326(2) provides that goods held on approval are not subject to the claims of the buyer's creditors, this only assures the creditor if there is *no* sale, (which is not the case here) but has no applicability to extend the time period of RCW 62A.9–312(4).[19] Thus, the tractor was "collateral" within the meaning of RCW 62A.9–105(1)(c)[20] from the date of its delivery.

The majority relies upon *Brodie Hotel Supply, Inc. v. United States,* 431 F.2d 1316 (9th Cir. 1970), as favorable to its position. However, the Ninth Circuit held that *Brodie* had fulfilled the demands of the exception provided in section 9–312(4) because "Although Lyon might have been liable for the reasonable rental of the equipment . . . he did not owe performance of an 'obligation secured' by the collateral in question until" the agreement had been executed. *Brodie, supra* at 1319. But *Brodie* is inapposite on the facts. Here, the executed agreement called for the obligation of interest on the contract to begin to accrue from the date of the contract. Thus, PBI is considered a debtor as of April 8, 1976.

In *James Talcott, Inc. v. Associates Capital Co.,* 491 F.2d 879 (6th Cir. 1974), the court decided a similar issue. There, Getz, a heavy construction contractor, executed a promissory note to Talcott giving a security interest in all

---

[19]This approach is also consistent with the fact that the risk of loss remains with the seller until acceptance.

[20]RCW 62A.9–105(1)(c) states:
"'Collateral' means the property subject to a security interest, and includes accounts, contract rights and chattel paper which have been sold;"

after–acquired property. Subsequently, Getz negotiated with Highway Equipment Co. (Highway) for the purchase of two Caterpillar tractors. One tractor was delivered to Getz on February 17, 1969; an agreement was signed on February 25, 1969, and Highway filed on March 3, 1969. Getz failed to make payments and a priority dispute arose. The court resolved the issue in favor of Talcott by stating:

> The only question that remains is when did Getz receive possession of the collateral as a "debtor" . . .
>
> The District Court answered this . . . by noting that "Getz's obligation was owed . . . on the date that he received possession . . . Perhaps the most telling exposure of the flaw in Highway's analysis was delivered by the District Court.
>
> "*It would be a frustration of this purpose* [certainly in commercial transactions under the U.C.C.] *to hold that a purchase money secured party can deliver goods to his debtor, delay indefinitely before entering into a security agreement which binds the debtor retroactively as of the delivery date, and still obtain a perfected security interest by filing within ten days of the agreement.*"

(Italics mine.) *James Talcott, Inc., supra* at 882–83. The court reasoned that regardless of when the agreement was entered into, Getz possessed the equipment as a debtor for more than 10 days prior to the filing of the statement. *See also Sunshine v. Sanray Floor Covering Corp.,* 64 Misc. 2d 780, 783, 315 N.Y.S.2d 937, 941 (1970).

A similar result was reached in *North Platte State Bank v. Production Credit Ass'n,* 189 Neb. 44, 200 N.W.2d 1 (1972). There Gerald Tucker received an operating loan from Production Credit Association (PCA) and granted a security interest in all after–acquired livestock. He took delivery of some cattle from a third party with an agreement that payment and transfer of a bill of sale were to take place after the date of possession. He later borrowed funds from North Platte State Bank (to make payment). The bank took a security interest in the cattle. A priority dispute arose when Tucker defaulted on his payments to

PCA. The Nebraska Supreme Court held that PCA had priority since the bank had failed to satisfy the requirements of section 9–312(4) by not filing within 10 days after Tucker took possession. *North Platte State Bank,* 189 Neb. at 52, 200 N.W.2d at 6. The court noted: "[A]lthough [the bank] filed its statement within 10 days after it made its loan, the filing occurred almost 2 months after the cows had been delivered . . ." *Id.* Although the code does not define the term "possession" priority rules turn on the time of receipt of possession and not upon the time the debtor obtained rights in the collateral. *See* 2 P. Coogan, *Secured Transactions Under the Uniform Commercial Code* § 19.02(3)(a) (1979). The rationale behind this approach was eloquently stated as follows:

> We observe that the 10–day grace period in itself allows for a permissible flexibility in the practical aspects of consummating a purchase money transaction. By their nature grace periods must have a fixed time limit, or they become meaningless. We cannot extend judicially another grace period over the Code grace period. We cannot pile flexibility upon flexibility. The purchase money priority is an exception to the first to file rule, and it should be applied only in accordance with the limitations established by the Code. To interpret section 9–312 (4), U. C. C., in the manner the Bank urges would not only be contrary to the plain meaning of the language used in the statute but would expose an original lender to such serious practical risks that the whole structure of the Code would be impaired or endangered, because the original lender could never feel sure that he could rely on his collateral in his future dealings with the debtor.

*North Platte State Bank,* 189 Neb. at 54, 200 N.W.2d at 7. Moreover, the court in distinguishing *Brodie, supra,* stated:

> The language and the reasoning of the Brodie case . . . have been seriously criticized. . . . *see* 27 the Business Lawyer, Kennedy, Secured Transactions, 755 at p. 768 (1972); and Comment, 49 No. C. L. Rev. 849 (1971).

*Id.* at 55, 200 N.W.2d at 7.

The code's general purpose is to create a precise guide for commercial transactions under which businessmen can con-

924

fidently predict the results of their dealings. Harvester merely had to file the agreement within 10 days of the tractor's delivery into possession of PBI for the protection of its interest pursuant to RCW 62A.9–312(4). Its failure to take this simple, reasonable step should have resulted in the loss of its PMSI priority to the Bank of California.

For these reasons and for the rationale expressed in *Rainier Nat'l Bank v. Inland Mach. Co.*, 29 Wn. App. 725, 631 P.2d 389 (1981) (McInturff, C.J., dissenting) I would affirm the judgment of the Superior Court.