141 F.3d 1173
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
BASKIN DISTRIBUTION, INC., Plaintiff-Counter-Defendant-Appellant,
v.
PITTWAY CORPORATION, a Delaware Corporation, successor in
interest to Apex Security Alarm Products, Inc.,
Defendant -Counter-Claimant-Appellee.
 No. 96-35882.
D.C. No. CV-95-01033-BJR.
 United States Court of Appeals, Ninth Circuit.
 Decided March 9, 1998.
Argued and Submitted December 4, 1997 Seattle Washington.
 
 Appeal from the United States District Court for the Western District of Washington, Barbara J. Rothstein, Chief Judge, Presiding.
 Before REAVLEY,** GOODWIN and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Baskin Distribution, Inc. ("BDI"), a Washington based distributor of residential and commercial security systems, appeals the district court's grant of summary judgment in favor of Pittway Corporation, purchaser of the assets of Apex Security Company ("Apex"). BDI filed suit alleging that Apex breached a contract granting BDI exclusive distribution of security systems for Apex. Finding that no contract was ever formed, we affirm.
 
 I. BACKGROUND
 
 3
 Apex, located in North Carolina, manufactured home security devices that it distributed via exclusive distributors. In late 1994 continuing through mid-1995, Christopher Baskin, President of BDI and David Hanchette, Apex Director of Sales and Marketing, negotiated for BDI to become an Apex exclusive distributor for certain western regions. On May 8, 1995, Hanchette brought Baskin a proposed 24-month exclusive distribution agreement which was prepared for signature. When Hanchette left to return to North Carolina, Baskin had three unresolved objections to the distribution agreement. The minor objections concerned Baskin's wish to increase the periods for payment and for cure after notification of default from 30 to 60 days. The major unresolved issue was whether Baskin would be allowed to participate when Apex directly sold to "national account" customers. On May 9, 1995, Baskin made three handwritten changes concerning these issues to the proposed agreement, initialed each change, and signed the agreement. On that day, Baskin mailed the signed agreement to Apex, along with a cover letter noting the modifications to the agreement and requesting Hanchette to initial and date the changes.
 
 
 4
 Also on May 9, 1995, BDI placed an order for products from Apex. Apex shipped this initial stocking order in two installments on May 10 and May 18, 1995. BDI alleges that it had already begun distributing Apex advertising materials and receiving Apex product orders in May 1995, and that when customers from its geographical area called Apex regarding products they were referred to BDI. BDI has yet to pay for the initial stocking order.
 
 
 5
 On May 12, 1995, Pittway purchased all the assets of Apex. The distribution agreement with BDI was not listed as one of the specified liabilities Pittway assumed pursuant to the purchase agreement. On June 23, 1995, Pittway sent a letter to Baskin informing him that Pittway had decided to sell its Apex products directly to installing dealers bypassing exclusive distributors. Pittway offered to buy back any Apex products that BDI had not yet sold.
 
 
 6
 BDI filed suit in July 1995, claiming breach of contract and fraud. Apex counterclaimed against BDI for BDI's failure to pay for the initial stocking order shipped on May 9, 1995. BDI asserts that Pittway's counterclaim should be set-off against BDI's contractual damages claim. The district court summarily dismissed BDI's breach of contract claim and fraud charge, and denied BDI's motion for reconsideration. The court, in its thorough order, held that a reasonable jury could not find that the parties ever formed an exclusive distribution contract or that the actions of BDI and Apex constituted confirmation of such an agreement under the "merchant's confirmation" exception to the statute of frauds. The court also held that because no enforceable distribution contract was formed, the May 9, 1995 order constituted a single separate agreement, thus holding BDI liable for the price of the goods ordered and received regardless of the outcome of the breach of contract claim. BDI appeals the dismissal of its breach of contract claim and the grant of Apex's crossclaim summary judgment motion.
 
 II. DISCUSSION
 A. Standard of Review
 
 7
 This court reviews a grant of summary judgment de novo.[1] The court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law, and whether the district court correctly applied the relevant substantive law.[2] We must not weigh the evidence or determine the truth of the matters asserted but must only determine whether there is a genuine issue for trial.[3] The district court's grant of summary judgment may be affirmed if it is supported by any ground in the record, whether or not the district court relied upon that ground.[4]
 
 B. Choice of Law
 
 8
 Article 2 of the Uniform Commercial Code ("U.C.C.") governs the alleged distribution agreement between BDI and Apex because the agreement primarily involves the sale of goods.[5]
 
 
 9
 BDI argues that the district court erred in applying Washington law instead of North Carolina law because the Apex distribution agreement provides for the application of North Carolina law in regard to "the legal relations between the parties." This court will engage in a choice of law analysis only when an actual conflict exists between Washington law and the law of another state.[6] Both Washington and North Carolina have adopted Section 2-201 of the U.C.C. dealing with the statute of frauds.[7] We see no significant difference between the Washington and North Carolina law affecting this dispute.
 
 B. Promissory Estoppel
 
 10
 BDI argues that the doctrine of promissory estoppel prohibits Pittway from asserting the statute of frauds. BDI relies on Klinke v. Famous Recipe Fried Chicken, Inc., in which the defendant induced the plaintiff to leave his employ in Alaska and move to Washington to establish a food franchise.[8] Although the defendant in Klinke promised the plaintiff that the defendant would qualify and register in Washington as a dealer in franchises, he never did. The Washington Supreme Court construed the Restatement of Contracts section 178 comment f, which states that a promise to make a memorandum, if relied upon, "may give rise to an effective promissory estoppel if the Statute (of Frauds) would otherwise operate to defraud." Applying this language, the Klinke court concluded that on a motion for summary judgment, when facts are asserted which show that a promise was made to make and execute a written agreement, comment f allows an action for breach of contract notwithstanding the statute of frauds.[9] BDI argues that, like the plaintiff in Klinke, it has sufficient evidence to show that Apex promised to execute the distribution agreement, and therefore, BDI has an action based upon promissory estoppel if Pittway breached its subsequent promise to reduce the contract to an enforceable writing.[10]
 
 
 11
 The Washington Supreme court, however, in Lige Dickson Co. v. Union Oil of California, expressly distinguished the statute of frauds at issue in Klinke from the statute of frauds contained within the U.C.C..[11]
 
 
 12
 In interpreting and applying the statute of frauds under California law, this court has held that promissory estoppel cannot render an oral promise otherwise within the statute of frauds enforceable.[12] The Lige Dickson court adopted this view holding that "promissory estoppel cannot be used to overcome the statute of frauds in a case which involves the sale of goods.[13] Although the court recognized that the Restatement "authorizes enforcement of a promise which induced action or forbearance by a promisee notwithstanding the statute of frauds," it declined to apply this policy to the sale of goods and circumvent the U.C.C..[14] The Washington Supreme Court noted that the U.C.C. was designed in the hope that "commercial transactions could take place across state boundaries without the stultifying effect caused by differences in states' laws."[15] Thus, the court decided to "join the other courts which limit the doctrine of promissory estoppel from overcoming a valid defense based on the statute of frauds contained within the Uniform Commercial Code."[16] North Carolina courts have limited denying a defense of the statute of frauds to situations in which a plaintiff demonstrated that the defendant acted fraudulently or in bad faith. "The North Carolina courts have recognized to a limited extent the doctrine of promissory estoppel, but have not expressly recognized it in all situations.... The North Carolina cases which have applied the doctrine have only done so in a defensive situation, where there has been an intended abandonment of an existing right by the promisee. North Carolina case law has not approved the doctrine for affirmative relief."[17]
 
 
 13
 We affirm the district court's holding against BDI's promissory estoppel claim.
 
 
 14
 C. Merchant's Exception Under the Statute of Frauds
 
 
 15
 The Merchant's exception of the statute of frauds provides that the statute will be satisfied between merchants, "if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know of its contents."[18] Under such circumstances, the writing "satisfies the requirements of [a writing] against such party unless written notice of objection to its contents is given within ten days after it is received."[19] The failure to answer a written confirmation of a contract within ten days of receipt effectively takes away from the party who fails to answer the defense of the statute of frauds. If the defense fails because of the merchant's exception, the proponent of the oral contract still has the burden of proving that a contract was made before the proponent issued the written confirmation.[20]
 
 
 16
 BDI argues that the district court's determination that no reasonable jury could conclude that a contract had been formed or that the parties understood there to have been a confirmation is inconsistent with the record. The record indicates that BDI sent Apex the standard Apex distribution contract with the modifications signed by Baskin. The record does not show that Apex objected to these modifications within the proscribed ten day period. Apex subsequently shipped Apex products to BDI, referred its dealers to BDI, and gave BDI technical support and otherwise performed as required under the contract. BDI asserts that the modified agreement and cover letter are confirmatory writings and that the initial stocking order constitutes a confirmation of the distribution agreement. BDI contends that this evidence illustrates that Apex agreed to perform under the terms of the modified contract and that a jury should be allowed to weigh the evidence to determine whether or not Apex indeed acted consistent with the agreement.
 
 
 17
 While "questions about whether a party received the writing, whether it was received within a reasonable time, whether the receiver had reason to know its contents, sent objections, or the like, are questions of fact," whether a writing in confirmation of an oral contract satisfies the statute of frauds is an issue of law for the court.[21]
 
 
 18
 Relying on Howard Construction Co. v. Jeff-Cole Quarries, Inc.,[22] the district court determined that a confirmatory writing must be sufficient in and of itself to indicate that a contract for sale has been made. In Howard Construction, the court suggested that in order for a writing to indicate that the parties had reached an agreement and not simply negotiations, the writing should include the terms "in confirmation of," "as per our agreement," or "as sold to buyer."[23] Many other courts, however, have not required that the confirmatory writing expressly refer to the oral contract which it confirms or include specific contents, but only that the writing afford a basis for believing the offered oral evidence rests on a real transaction.[24]
 
 
 19
 Under Washington law, when "there are more than one written document that relate to the same subject matter, [which] are not inconsistent with each other and appear to be executed as part of the same transaction, they may be considered together to determine the parties' intent."[25] The parol evidence rule does not apply when the parties are seeking to establish the validity or invalidity of a contract.[26] The parol evidence rule "presupposes an action based on a valid contract; and if the issue is as to the existence or validity of the alleged contract, the rule, by its very terms, has no application."[27]
 
 
 20
 The district court properly examined both the cover letter, BDI's and Apex's actions and the distribution agreement to determine that BDI did not satisfy the merchant's exception to the statute of frauds. Baskin's cover letter to Apex states that he modified the distribution agreement in certain respects and requested that Hanchette approve the modifications made by initialing and dating the contract. Hanchette never did. In addition, the court found important the language in the cover letter from Baskin to Hanchette in which Baskin wrote, "[w]e are excited as ever at Baskin Distribution to begin our relationship with Apex and hope that these changes do not prevent a mutually beneficial relationship from beginning." The district court concluded that this language, along with Baskin's alteration of the distribution agreement, indicate that the contract was in the negotiation process, and thus not yet formed. The proponent of an oral contract always maintains the burden of proving that a contract was made before the proponent issued the written confirmation.[28] The writing cannot be a confirmation of a nonexistent contract. The merchant's exception does not apply.
 
 C. Set-Off
 
 21
 The district court granted Pittway's motion for summary judgment on a counterclaim against BDI arising out of BDI's decision not to pay for the initial stocking order of May 9, 1995. The court found that the stocking order was wholly separate from the distribution agreement and that BDI is liable for $58,964.62 plus interest (the price of the goods ordered and received).
 
 
 22
 BDI has refused to pay for this initial order because it believes the goods price should serve as a set-off for the alleged breach of contract. BDI asserts that the initial stocking order was wholly related to the distribution agreement as BDI would have no interest in a single inventory order without the 24-month exclusive distribution agreement. BDI argues that it is unjust to compel BDI to pay for an order it placed in reliance on an agreement which Apex now disavows.
 
 
 23
 Under the U.C.C., an individual may have an obligation to pay for goods tendered and accepted notwithstanding allegations that a distribution agreement has been breached.[29] In this case, the district court found that the order placed for the goods BDI received was separate from any alleged distribution agreement entered into between the parties. Accordingly, the district court correctly held BDI liable for the costs of the goods received.
 
 
 24
 AFFIRMED.
 
 
 
 **
 Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 Summers v. A. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir.1997) (citations omitted); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir.1987)
 
 
 [2]
 Id
 
 
 [3]
 Id
 
 
 [4]
 Sicor Ltd. v. Cetus Corp., 51 F.3d 848, 860 n. 17 (9th Cir.1995)
 
 
 [5]
 See Glacier Optical, Inc. v. Optique Du Monde, Ltd., 816 F.Supp. 646, 653 (D.Or.1993), aff'd, 46 F.3d 1141 (9th Cir.1995) (finding under Washington law, an alleged oral agreement to distribute eyewear was governed by WASH.REV.CODE ANN. § 62A.2-201); see also American Suzuki Motor Corp. v. Bill Kummer, Inc., 65 F.3d 1381, 1385-86 (7th Cir.1995) (finding distributorship agreement as predominantly contract for sale of goods); Babst v. FMC Corp., 661 F.Supp. 82, 87-88 (S.D.Miss.1986) (same). The Uniform Commercial code as adopted in Washington is found at WASH.REV.CODE ANN. TITLE 62A
 
 
 [6]
 Rice v. Dow Chem. Co., 124 Wash.2d 205, 875 P.2d 1213, 1216 (Wash.1994)
 
 
 [7]
 N.C.GEN.STAT. § 25-2-201 (1994-1996); WASH.REV.CODE ANN. § 62A.2-201 (West 1997)
 
 
 [8]
 94 Wash.2d 255, 616 P.2d 644 (Wash.1980) (en banc)
 
 
 [9]
 616 P.2d at 646-47
 
 
 [10]
 The purpose of promissory estoppel is "to make a promise binding, under certain circumstances, without consideration in the usual sense of something bargained for and given in exchange. If the promisee's performance was requested at the time the promisor made his promise and that performance was bargained for, the doctrine is inapplicable." Id. at 648 n. 4 (quoting Raedeke v. Gibraltar Sav. & Loan Ass'n, 10 Cal.3d 665, 111 Cal.Rptr. 693, 517 P.2d 1157, 1161 (Cal.1974))
 
 
 [11]
 Lige Dickson Co. v. Union Oil Co. of Cal., 96 Wash.2d 291, 635 P.2d 103, 105 (Wash.1981) (en banc)
 
 
 [12]
 C.R. Fedrick, Inc. v. Borg-Warner Corp., 552 F.2d 852, 856-57 (9th Cir.1977)
 
 
 [13]
 Lige Dickson, 635 P.2d at 107
 
 
 [14]
 Id. at 105
 
 
 [15]
 Id. at 107
 
 
 [16]
 Id
 
 
 [17]
 Home Electric Co. of Lenoir, Inc. v. Hall & Underdown Heating & Air Conditioning Co., 86 N.C.App. 540, 358 S.E.2d 539, 541 (N.C.App.1987), aff'd 322 N.C. 107, 366 S.E.2d 441 (N.C.App.1988)
 
 
 [18]
 WASH.REV.CODE. § 62A.2-201(2)
 
 
 [19]
 Id
 
 
 [20]
 U.C.C. § 2-201 cmt. 3
 
 
 [21]
 GPL Treatment, Ltd. v. Louisiana-Pacific Corp., 323 Or. 116, 914 P.2d 682, 686 (Or.1996) (citing Ronald A. Anderson, 2 Uniform Commercial Code, § 2-201:146 (3d ed. 1982 & Supp.1995))
 
 
 [22]
 669 S.W.2d 221 (Mo.Ct.App.1984)
 
 
 [23]
 Id. at 227-28
 
 
 [24]
 See, e.g., Hilord Chem. Corp. v. Ricoh Elec., Inc., 875 F.2d 32 (2d Cir.1989) (holding no rigid requirement as to form or content of confirmatory writing); Rockland Indus., Inc. v. Frank Kasmir Assocs., 470 F.Supp. 1176 (N.D.Tex.1979) (writing need only be consistent with sale predicated upon prior transaction)
 
 
 [25]
 Spokane Helicopter Ser., Inc. v. Malone, 28 Wash.App. 377, 623 P.2d 727, 730 (Wash.App.1981)
 
 
 [26]
 Bond v. Wiegardt, 36 Wash.2d 41, 216 P.2d 196, 200 (Wash.1950); In re Prior Bros., Inc. Int'l Harvester Co. v. Bank of Cal., N.A., 29 Wash.App. 905, 632 P.2d 522 (Wash.App.1981)
 
 
 [27]
 Bond, 216 P.2d at 200
 
 
 [28]
 U.C.C. § 2-201 cmt. 3
 
 
 [29]
 United Beer Distrib. Co. v. Hiram Walker (N.Y.), Inc., 163 A.D.2d 79, 81, 557 N.Y.S.2d 336 (N.Y.App.Div.1990) ("The only sale documents herein [a series of purchasing orders] concern individual shipments of beer and have nothing to do with the asserted distribution agreement .")