B AND Y HEAVY MOVERS, INC., Plaintiff-Appellee and Cross-Appellant,
v. FLUOR CONSTRUCTORS, INC., Defendant-Appellant and Cross-Appellee.

First District (6th Division)   No. 1—89—3385

Opinion filed March 28, 1991.

Hedberg, Tobin, Flaherty & Whalen, of Chicago (William T. Coleman, of counsel), for appellant.

Hostein, Mack & Klein, of Chicago (Jewel N. Klein, of counsel), for appellee.

JUSTICE EGAN delivered the opinion of the court:

The plaintiff, B&Y Heavy Movers, Inc. (B&Y), filed a complaint against Fluor Constructors, Inc. (Fluor), and Union Oil Company of California (Union) for breach of a bailment agreement. After a bench trial, the judge entered judgment in favor of B&Y against Fluor but judgment in favor of Union against the plaintiff. Fluor appeals, contending that B&Y failed to establish that it owned the bailed property and that the judge improperly allowed a witness to testify for B&Y in rebuttal. B&Y cross-appeals, contending that the award of damages was inadequate. B&Y asks that this court fix the damages in a specific amount or, alternatively, to remand the case for a new trial on damages only. B&Y does not appeal the judgment in favor of Union.

Fluor was hired by Union as the general contractor on a job at Union's refinery in Lemont, Illinois. One of Fluor's responsibilities as general contractor was to move several enormous oil refinery vessels from Louisiana, up the Mississippi River, to the jobsite in Lemont. The vessels were approximately 100 feet long and weighed about 450 tons each.

Fluor entered into a contract with B&Y whereby B&Y agreed to provide a transport system for moving the vessels. B&Y's transport system consisted of 12 large dollies, each of which was capable of lifting 50 tons. B&Y also provided Fluor with saddle supports which were custom designed to fit the vessels.

On May 9, 1985, B&Y's transport system was used to move the vessels onto a barge in Lake Charles, Louisiana. The barge arrived in Lemont sometime during the week of June 13 or 14, 1985. The operators of the dollies were primarily employees of Fluor. The contract required B&Y to provide one "field serviceman" who would be present during all operations involving the dollies; however, all field labor for the operational phase was provided by Fluor. B&Y's field serviceman was Marvin Schmitt. Schmitt advised Kent Goodman, Fluor's rigging engineer, about the operation of B&Y's equipment, but Goodman supervised the craftsmen who actually operated the system.

On June 12, 1985, B&Y's President, Ron Nation, sent mailgrams to the people he had dealt with at Fluor's home office in Irvine, California, and to John Ervin, Fluor's on-site project manager in Lemont, Illinois. The mailgrams instructed Fluor that the B&Y equipment in Fluor's custody was "to be released only to Ronald V. Nation, President of B&Y[.] *** Marvin Schmitt, Technician, is not an authorized agent of B&Y

Heavy Movers, Inc." The mailgrams also requested that Fluor advise B&Y by phone or telegram when the equipment would be available for pick up.

Fluor responded to B&Y on June 21, 1985, acknowledging receipt of the mailgrams and stating Fluor's understanding that "Marvin Schmitt is on site to act as technical consultant and does not have authority to act in behalf of B&Y Heavy Movers." The response also stated that the equipment would be available for pick up on June 24, 1985.

When B&Y's mailgram was received by John Ervin, Fluor's project manager at Lemont, Ervin discussed the mailgram with two administrators at Fluor's headquarters in Irvine, California. Ervin then made copies of the mailgram and distributed them at the Lemont jobsite to his subordinates, including Kent Goodman. Ervin also discussed the mailgram with Marvin Schmitt. Fluor's work site was surrounded by a fence, and equipment could be removed from the site only with a gate pass signed by certain Fluor employees. To prevent removal of the dollies, Ervin instructed Fluor employees not to sign gate passes for removal of B&Y's equipment from the site.

When Fluor's employees were finished using the B&Y equipment on June 21, 1985, they moved the equipment from that portion of the Lemont site which was under Fluor's control and placed the equipment in a "laydown area" under Union's control. Ervin knew that a gate had been removed from Union's portion of the site in May 1985, and therefore the laydown area was not completely enclosed by a fence. The laydown area was patrolled by roving guards employed by Union. However, Ervin did not notify the guards or anyone from Union about the mailgram.

Schmitt arrived at the Lemont site around 7:15 a.m. on June 22, 1985, and entered Union's portion of the site through the open gate. He removed the steel support structure from the dollies, attached chains to the dollies and used an available pump truck to pull the dollies off the Lemont site, six at a time. Schmitt completed this task at 1 or 1:30 in the afternoon. He then used a truck and truck crane, which he had previously ordered, to load the dollies. He finished loading the dollies around 5 p.m., and then shipped them to Jake's Crane and Rigging (Jake's) in Las Vegas. During the removal, Schmitt saw a few Union guards who passed by every 1½ to 2 hours.

Kent Goodman testified that he knew that the gate in the laydown area was open on the day that Schmitt took the dollies, and John Ervin testified that he knew that pump trucks were routinely left in the laydown area with keys in their ignitions.

The next Monday after he took the dollies, Schmitt sent the following telegram to B&Y:

"Please be advised that 12 dollies on a loan to B and Y Heavy Movers by myself for transporting vessels 501 and 502 and 503/ 504 were removed on 6-22-85 from the Union Oil Refinery holding area at Lemont, Illinois, without knowledge or permission of Fluor Constructors, Inc.

Marvin G. Schmitt"

Nation made several attempts to locate Schmitt and the dollies. He worked with the Lemont police and insurance investigators; he asked a friend in Alaska to look for Schmitt there; he chased after a truck hauling dollies on a California expressway; and he inquired about the dollies at Jake's in Las Vegas. Kent Goodman testified that he knew that Schmitt had taken the dollies to Jake's during the latter half of 1985 and that Jake's had used the dollies on a job for Fluor in 1986.

On the issue of liability, Fluor depends entirely on its claim that B&Y failed to prove that it had a greater possessory interest in the dollies than Schmitt did. It does not argue that the evidence is insufficient to establish a violation of the bailment agreement.

Nation and Schmitt had first met in 1980, and Nation hired Schmitt to do some design work relating to a system for transporting oil-drilling rigs. At the end of 1982, Nation and some members of his family purchased B&Y Stanton House Movers, and renamed it B&Y Heavy Movers. Shortly after that, Nation and Schmitt met again. Schmitt was having financial troubles, and he asked Nation if he could store his equipment and machinery at B&Y's facility and use an office and a desk. Nation and Schmitt struck a casual agreement, and Schmitt moved in with 12 dollies, three pallets of dolly parts, and a fairly complete machine shop. Most of the equipment was stored at the B&Y facility on Batavia Avenue in Orange, California.

Schmitt testified in his evidence deposition that he developed, designed and built the 12 dollies for a Canadian company. In the late 1970s, he began using the dollies in his own business called the "Holometer Company." The parties stipulated at trial that, when Schmitt brought the 12 dollies to B&Y's premises, they were fully assembled, but they did not have tires, rims or brakes, and eight of the dollies were lacking steering cylinders.

Schmitt was given the title of "Chief Engineer" of B&Y; however, Nation testified that Schmitt never actually became an employee of B&Y. Schmitt's job was to obtain business for B&Y and for himself; the dollies would be used only on jobs Schmitt obtained. Schmitt was taken off B&Y's payroll a few months after he began working with B&Y, after

B&Y received notice from the Internal Revenue Service that Schmitt owed $22,000 to $25,000 in back taxes and was facing about $26,000 liability in judgments or lawsuits. Schmitt continued to work with B&Y, however, and B&Y paid Schmitt's expenses. Schmitt agreed to allow B&Y to use his dollies until the dollies became profitable, and then to consider a "fixed agreement" with B&Y.

Nation testified that he wanted to buy Schmitt's dollies and use them to get into the heavy hauling business, but B&Y's board of directors refused to spend the $150,000 to $200,000 needed to make the dollies "whole and useable." Nation worked out an agreement with Schmitt to trade 10 of B&Y's dollies to Schmitt in exchange for Schmitt's 12 dollies. Nation further agreed that if the dollies were profitable, B&Y would assist Schmitt with the IRS and his creditors, put him on the payroll, and give him a share of the profits.

Nation testified that his agreement with Schmitt was contained in an "Agreement to Trade." The agreement was originally drafted between B&Y and the Holometer Company, owned by Schmitt. Nation's attorney expressed concern that perhaps Schmitt was the owner of the dollies, rather than the Holometer Company. Therefore, Nation had the agreement retyped so that it would be between B&Y and Schmitt individually.

Nation identified a document, first produced at Schmitt's evidence deposition, as the earlier version of the agreement. That document, signed only by Nation, states as follows:

"B&Y Heavy Movers Inc. hereby agrees to trade 10 (ten) of our McMillan Heavy duty house moving dollies, all warranteed [sic] to be in excellent condition for the following equipment belonging to the Holometer Company.

One lot of partially completed dollies and related parts."

There is a blank space for Schmitt's signature above a line entitled "Holometer Company."

Nation testified that a later agreement, between B&Y and Schmitt individually, was signed by himself and by Schmitt. Nation said that his practice was to have two of everything typed and that he believed he and Schmitt signed an original and one copy of the agreement. After his memory was refreshed by his March 1989 deposition testimony, however, he conceded that there was only one typed version of the later agreement with Schmitt.

Nation stated that he believed he put the signed agreement in his safe at B&Y's office in Orange, California. The safe was often kept unlocked for hours at a time, and Nation discovered that the agreement was missing a few days after the dollies were taken. He testified that, in

addition to the signed agreement, Schmitt's machinery, drafting equipment and file drawers were also removed from B&Y's property without Nation's knowledge at or about the time the dollies were taken.

Nation was unable to locate the document or his former secretary who had typed it. Consequently, the only version of the agreement presented at trial was the earlier version, between B&Y and the Holometer Company, which was signed only by Nation.

Schmitt denied ever signing or agreeing to the later agreement. He testified that he never sold, traded, or gave his dollies to Nation or B&Y. Schmitt admitted that he knew that the B&Y safe was occasionally unlocked but denied taking the agreement. Schmitt admitted that he had rented a truck from Jake's and removed his files and equipment from B&Y's premises at Orange, California. He said that he took the equipment in early June of 1985, before the barge carrying the dollies arrived at the jobsite in Lemont, and that he and Nation discussed his plans to go work for Jake's in Las Vegas.

B&Y called Lou Hislop as a rebuttal witness, over Fluor's objection. Hislop was a business associate of B&Y, and he was one of the persons named by Nation as having been told about Schmitt's signing of the agreement. Hislop testified that he had seen an original version of the agreement on B&Y's black and red letterhead and that the document was signed by both Schmitt and Nation. However, he could not remember what Schmitt's first name was, how his last name was spelled, or whether his signature contained a middle initial.

Fluor first maintains that B&Y had the burden of proving that it had title to the dollies as against Schmitt and failed to do so. We judge that, as a matter of law, B&Y did not have the burden of proving it had title to the dollies as against Schmitt and that the finding of the judge that B&Y had a possessory right superior to Schmitt was not against the manifest weight of the evidence.

Two Illinois cases address the bailee's right to give possession of the goods to a third party. In *Follett v. Edwards* (1889), 30 Ill. App. 386, the court stated the following rule:

"The bailee *** can not set up a paramount title of a third person as a defense against the action of the bailor, unless expressly or impliedly authorized to do so by the owner. But if the latter demands the property of the bailee before he parts with the goods, and the bailee yields to the demand, he is protected against all claims of the bailor." (*Follett*, 30 Ill. App. at 388.)

The court restated the rule in *Agnew v. Baker* (1917), 204 Ill. App. 56, as follows:

"As a general rule a bailee may not, for his own benefit, deny the right of the bailor or avail himself of the title of a third person, although that person be the true owner. [Citation.] He cannot claim title in himself or title in another except that he may show as against the claim of the bailor that he has been deprived of the property by process of law or has yielded possession to one having paramount title, or that he is defending on the title and right and by the authority of a third person." 204 Ill. App. at 59-60.

Fluor concedes that it did not "yield" possession of the dollies to one claiming to be the true owner. Nevertheless, Fluor argues that it should be able to defend the case on the ground that the true owner actually took possession of the dollies. Fluor does not cite any law in support of this proposition.

Other jurisdictions have decided the issue adversely to Fluor's position. The supreme court of Minnesota explained that a bailee is estopped from denying title of the bailor in *Blackorby v. Friend, Crosby & Co.* (1916), 134 Minn. 1, 158 N.W. 708:

"A bailee, when he receives the property by virtue of the bailment, legally admits the right of the bailor to make the contract of bailment. After this subservient relation of the bailee to the bailor in respect to the property is established, the law forbids him to dispute the title of the bailor." 134 Minn. at 3, 158 N.W. at 709.

Some jurisdictions follow the rule that the bailee may yield possession of the bailed goods to one claiming to be the true owner, but the bailee does so at his own risk. The burden is then on the bailee to establish that the third party is indeed the true owner. See *Yokohama Specie Bank, Ltd. v. Geo. S. Bush & Co.* (1922), 121 Wash. 272, 209 P. 676; see also *Atlantic & Birmingham Ry. Co. v. Spires* (1907), 1 Ga. App. 22, 57 S.E. 973.

The supreme court of California has stated the rule as follows:

"When the bailor has obtained the property by some fraud practiced upon the true owner, the bailee can, upon the authority of such true owner *** defend upon such true owner's title; but he always assumes such defense at his peril, and takes upon himself the burden of showing the right to retain the property under such instructions." (*Wetherly v. Straus* (1892), 93 Cal. 283, 287, 28 P. 1045, 1046.)

The rule was limited by *Branch v. Bekins Van & Storage Co.* (1930), 106 Cal. App. 623, 290 P. 146, in which the court held that "a bailee is liable in conversion for delivering goods upon the claim of a third party, except under valid legal process in a suit in which the bailor is himself a party

and then only after due notice has been given the bailor." 106 Cal. App. at 630, 290 P. at 150.

■■ We agree with B&Y's argument that to place the burden upon a bailor to prove his title to the bailed goods in an action for breach of a bailment agreement would lead to consequences far-reaching and manifestly unfair. If goods were removed from the possession of a bailee, the bailee could merely deny the validity of the bailor's contract and make the bailor provide proof of his ownership of the goods. For example, if a customer took an item of jewelry to be repaired, the jeweler could deny the validity of the claim ticket and could assert that the jewelry belonged to one of his employees. The customer would have to prove his possession right to the jewelry through some means other than the claim ticket in order to get it back. Fluor cites no legal authority or public policy reasons to support its position. We are confident that no such authority exists. We are more confident that there are no policy reasons to support Fluor's argument.

■■ The trial judge heard conflicting evidence regarding the ownership of the dollies. Ron Nation testified that he and Schmitt both signed an agreement to trade, whereby title to the dollies passed from Schmitt to Nation. Lou Hislop testified that he saw the agreement to trade and that it was signed by both Nation and Schmitt. Schmitt denied signing the agreement. The trial judge also evaluated the conduct of the parties with respect to the dollies and determined that Nation's conduct was consistent with ownership. Nation spent a considerable sum of money improving the dollies. Additionally, Nation used the dollies on several projects for B&Y. Schmitt's conduct, on the other hand, was inconsistent with ownership. Schmitt conceded that he did not have authority to take the dollies from Fluor's refinery site. After he took the dollies, Schmitt sent a mailgram to B&Y stating that he had taken the dollies and specifically noted that he took them without Fluor's knowledge or permission.

From all of the evidence presented, the trial judge found that B&Y was the owner of the dollies. This finding is not against the manifest weight of the evidence. Because Fluor failed to meet its burden of proving that it was owner of the dollies, and that B&Y had no right to bail the property, the trial judge correctly held Fluor liable for breach of the bailment contract.

Fluor next maintains that the court erred in permitting the testimony of Lou Hislop; it argues that that testimony should have been barred as a discovery sanction. Fluor objected to Hislop's testimony under Supreme Court Rule 219 (107 Ill. 2d R. 219), arguing that Hislop's name had not been disclosed before trial.

The attorneys for B&Y and Fluor had discussions regarding the identity of their witnesses. B&Y's attorney mentioned that she would call Kenneth Heusser to identify the persons who had signed the later agreement to trade. The day before trial began, however, B&Y's attorney informed Fluor's attorney that she had made a mistake, and that Lou Hislop, rather than Kenneth Heusser, would testify regarding the signatures on the agreement.

■ A trial court has broad discretion in determining whether to impose sanctions under Rule 219 for a party's failure to comply with discovery requests. (*Ashford v. Ziemann* (1984), 99 Ill. 2d 353, 368, 459 N.E.2d 940.) The exercise of such discretion will not be disturbed unless an abuse is apparent. (*Perimeter Exhibits, Ltd. v. Glenbard Molded Binder, Inc.* (1984), 122 Ill. App. 3d 504, 514, 461 N.E.2d 44.) Therefore, the party seeking reversal of a trial judge's ruling on an evidentiary matter has the burden of establishing prejudice. *Atkins v. Thapedi* (1988), 166 Ill. App. 3d 471, 477, 519 N.E.2d 1073.

■ Discovery sanctions are appropriate when noncompliance with discovery requests is unreasonable and amounts to "a deliberate and pronounced disregard for the rules and the court." (*Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 415, 476 N.E.2d 1232.) Fluor concedes that B&Y's failure to disclose Hislop prior to trial was inadvertent. Therefore, B&Y's actions cannot be characterized as a deliberate disregard for the rules and the court.

■ Counsel for Fluor was aware that a witness would testify regarding the signatures on the later agreement to trade; he simply thought that the witness would be Heusser rather than Hislop. However, he did not even depose Heusser. Additionally, when Fluor was notified that Hislop would testify, the judge offered Fluor the opportunity to question Hislop before he testified, but Fluor did not avail itself of that opportunity. We conclude that the judge did not abuse his discretion in allowing Hislop to testify.

For these reasons, the judgment in favor of B&Y on the question of liability is affirmed.

■ In its cross-appeal B&Y maintains that the judge erred in his award of damages. A trial judge's award of damages will not be reversed unless it is clearly erroneous or against the manifest weight of the evidence. (*Lynch v. Precision Machine Shop, Ltd.* (1982), 93 Ill. 2d 266, 443 N.E.2d 569.) To reverse a finding of damages, the reviewing court must find that the trial judge ignored the evidence, or that the measure of damages was erroneous as a matter of law. *MBC, Inc. v. Space Center Minnesota, Inc.* (1988), 177 Ill. App. 3d 226, 234, 532 N.E.2d 255.

Fluor maintains that the judge's award should be sustained, because, it argues, the judge properly considered all of the testimony presented and then reduced the value of the dollies to reflect inflation and depreciation. We disagree. There is no evidence in the record from which the judge could have calculated the proper amount of inflation and depreciation by which to reduce the award. In fact, depreciation and inflation were not raised as issues at the trial. Therefore, the judge could not have relied on them in calculating B&Y's damages.

■ Fluor next contends that the correct measure of damages for breach of a bailment agreement is the market value of the goods at the time of the loss. (*Mueller v. Soffer* (1987), 160 Ill. App. 3d 699, 706, 513 N.E.2d 1198.) However, B&Y correctly notes that when market value is difficult to ascertain, for example, where the property converted is unique, a court may award damages using some other reasonable calculation of value, such as replacement cost. *Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 934-35, 419 N.E.2d 578; *Williams v. Board of Education of Clinton Community Unit School District No. 15* (1977), 52 Ill. App. 3d 328, 333, 367 N.E.2d 549.

The parties both agree that the dollies are unique and state of the art. Schmitt designed the dollies, and he holds a patent on his design. Each of the 12 dollies is capable of supporting at least 50 tons. The feature which sets these dollies apart from ordinary dollies is a castered-steering system, similar to the wheels on a grocery cart: when the front wheels turn, the rear wheels follow. Additionally, the dollies have a unique leveling system which allows them to carry a load in a level manner, regardless of the condition of the terrain on which the dollies are traveling. The dollies are usually used in sets, rather than individually. A large frame is custom designed for each moving job, and the frame is then mounted onto the dollies. The dollies and the frame together are referred to as a "transport system."

Nation testified that there were two ways to value the replacement cost of the dollies: (1) calculate the cost of building them "from scratch"; or (2) calculate the cost of purchasing a standard dolly and modifying it with the state-of-the-art elements ("self-propulsion, a bunk jack, brakes, self-steering mechanism, a castered-steering modification and wheels and tires"). He testified that the dollies would cost $32,755 each, or $393,060 if made "from scratch." Counsel for Fluor objected to Nation's testimony regarding the cost of purchasing standard dollies and modifying them, and the trial judge sustained the objection. No issue is made of this ruling. In its post-trial motion, B&Y conceded that some of the dollies taken by Schmitt did not have brakes or steering cylinders, thereby reducing the claimed total value of the dollies to $354,508.

Schmitt testified that in 1981, before he began working with B&Y, he sold a complete set of 12 dollies for $15,600 each. He also sold 11 dollies plus some ancillary equipment at a "fire sale" for $97,000. Schmitt conceded that the price obtained at the fire sale "doesn't reflect the retail price."

Nation testified in rebuttal that the 10 dollies he traded to Marvin Schmitt were worth $100,000. He also said that B&Y invested an average of $21,000 per dolly in additions and modifications to the dollies acquired from Schmitt.

Kent Goodman testified for Fluor that he was not familiar with the distinction between the various types of dollies that had been discussed at trial (the castered-steering dollies, "Callahan" dollies and "McMillan" dollies). He stated that he understood that the Callahan dollies were basically the same as the dollies taken by Schmitt, except they did not have castered steering. He estimated the value of Callahan dollies at $14,000 to $18,000 each. The trial judge awarded B&Y damages in the amount of $110,000.

The record shows that the judge based his calculation of damages on the replacement cost of the dollies. He considered Nation's testimony that the cost of rebuilding the dollies from scratch would be approximately $360,000. He also relied heavily on the testimony of Kent Goodman. Goodman testified that a Callahan dolly was very similar to the stolen dollies, except that the Callahan dolly did not have castered steering, and he said that a Callahan dolly could be purchased for $14,000 to $18,000 at the time of trial in 1989. Goodman did not testify about the cost of a Callahan dolly in 1985. The judge also considered Schmitt's testimony that he sold 12 dollies in 1981 for $186,200, and that he sold 11 complete dollies plus parts for a twelfth for $97,000 at a fire sale.

B&Y argues that the judge erred in relying on Schmitt's testimony, because "eleven (11) dollies at a 'fire sale' cannot be compared to twelve (12) dollies in 1985." The judge, however, felt that it was appropriate to consider Schmitt's testimony. The judge conceded, as Schmitt did, that the price paid at a fire sale would not be equivalent to a retail sale; however, he noted that because Nation was an expert in the business he would probably be able to replace the dollies at a price below retail. Therefore, the judge's mere consideration of Schmitt's testimony was not erroneous.

We believe, however, that the judge did err in calculating the value of the dollies at the time B&Y acquired them from Schmitt, rather than at the time of the loss. The proper measure of damages is the value of the dollies on June 22, 1985, the date that Schmitt took the dollies from the Union site in Lemont. (*Mueller*, 160 Ill. App. 3d at 706.) The

judge, however, calculated the damages as of the date that B&Y originally received the dollies from Schmitt, approximately 1½ years before they were taken. When B&Y received the dollies from Schmitt in December of 1983, they were only partially completed. Nation testified that B&Y had to invest approximately $20,000 on each dolly to make the dollies "whole and useable." As a result of B&Y's investment, the dollies were presumably more valuable on the date of the loss than they were when Schmitt originally traded them to B&Y. The trial judge, however, considered only the value of the unimproved dollies. The judge stated as follows:

> "[T]he Court does state that any improvements made by B&Y to these dollies [were] for their own benefit and voluntarily and they really can't be reimbursed for any of those improvements ***."

The burden is always on the plaintiff to prove his damages to a reasonable degree of certainty. (*Jensen*, 94 Ill. App. 3d at 933.) However, a damage award is contrary to the manifest weight of the evidence if the reviewing court finds that the trial court ignored the evidence or that its measure of damages was erroneous as a matter of law. (*MBC*, 177 Ill. App. 3d at 234.) In this case, the judge calculated the damages as of the date that B&Y acquired the dollies, rather than as of the date of the loss. Because the judge used an incorrect legal standard in calculating the damages, his measure of damages is erroneous as a matter of law, and the case must be remanded with directions to determine the value of the dollies at the time Schmitt took them from the Lemont site. B&Y has asked this court to fix the damages. We decline to do so. We believe the trial judge is in a better position to evaluate the property under the proper measure of damages.

Judgment affirmed in part, reversed in part and remanded with directions.

McNAMARA and LaPORTA, JJ., concur.